DIANE P. WOOD, Circuit Judge.
 

 For more than five years, Gale Q. Best, Jr., earned his living as a gasoline delivery truck driver at the Des Plaines, Illinois, facility of Shell Oil Company. Problems began when, on October 20, 1991, Best injured his left knee while making a gasoline delivery. The injury made it painful for Best to drive many of the trucks in Shell’s fleet. Eventually, after Best had spent some time on disability leave and had sought certain modifications in the truck cab to accommodate his tender knee, Shell placed him on unpaid leave of absence and Best resigned shortly thereafter. He now complains that Shell
 
 *-1039
 
 failed to meet its obligations under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101
 
 et seq.
 
 The district court granted summary judgment for Shell 910 F.Supp. 405. Because we conclude that the record contains disputed facts on the question whether Best is a “qualified person with a disability,” we reverse and remand for further proceedings.
 

 I
 

 After Best’s October 20, 1991, injury, he began to experience pain whenever he bent his knee more than 90 degrees inward toward his body. This made it painful for him to drive most of the trucks in Shell’s fleet, because the clutch and seat configuration required this type of knee position. In an effort to correct the problem, Best had arthroscopic surgery in December 1991. His treating physician, Dr. Rollo J. Nesset, released him for a gradual return to work on January 8, 1992. Shell gave him three days of a reduced workload and then assigned him to a full workload effective January 20, 1992. Unfortunately, Best continued to suffer from pain and swelling while operating the clutch of the trucks he drove. As a result, he was often assigned to office work. In May 1992, Shell asked Dr. Mark Levin to examine Best. Best reported to Dr. Levin that his knee did not bother him when he was seated in a Mack truck seat, rather than the Peterbilt seat he normally had used. Shell, accordingly, replaced the Peterbilt seat in his truck with a Mack seat, which seemed to do the trick. On the four or five occasions when he had to return to the Peterbilt seat, the pain returned as well.
 

 On October 12 and 13,1992, on Dr. Levin’s recommendation, Best was tested at Worker Rehabilitation Services in Chicago. Their functional capacity evaluation report confirmed that Best needed to drive the truck with the specially modified seat, which “decreased] the amount of knee flexion” and thus placed less force on the knee while working the clutch. In a letter of November 3, 1992, to Shell’s insurance carrier, Dr. Lev-in reported that Best had difficulty operating the clutch. He stated that in his opinion, Best would have difficulty continuing in his present position as a Shell gasoline truck driver because “[t]he demands on his knee may be too overwhelming” for driving duties. The result was that Best was placed on long-term disability leave on November 16, 1992. On April 22, 1993, Dr. Nesset examined him again and found that he could return to work provided he was given a truck with sufficient leg room to avoid the need to flex the knee beyond the 90-degree position when depressing the clutch pedal. Best communicated this news to Shell, but Shell refused to return him to work with those restrictions.
 

 Best filed a grievance contesting Shell’s decision. At a meeting of July 20, 1993, all concerned agreed to obtain the opinion of a third doctor, selected by mutual consent, and to abide by that doctor’s opinion. Shell thought better of matters, however, and on August 13,1993, it notified Best that it would not participate in the selection of the third doctor nor would it allow Best to return to work. In the meantime, during August and September 1993, Best was driving gasoline trucks for another company without experiencing trouble with his knee (because the trucks used by Best’s new employer contained sufficient leg room for him to drive without discomfort). In November 1993, Shell informed him that his leave of absence would thenceforth be without pay, which prompted Best’s resignation. After leaving Shell, Best was able to drive both a chemical delivery truck (manufactured by White) and a GMC truck' without incident.
 

 II
 

 On November 1, 1993, Best filed the present action against Shell, alleging violations of the ADA and the Illinois Human Rights Act (IHRA), 775 ILCS 5/2-102(A). Shell responded by filing a motion for summary judgment on both counts. Judge Holder-man, to whom the case had initially been assigned, granted summary judgment for Shell on the IHRA count in a ruling that is uneontested here, but he denied summary judgment on the ADA count, for the following reasons:
 

 In this case, plaintiff has presented medical evidence indicating that his knee injury significantly restricted his ability to per
 
 *-1038
 
 form as a truck driver. In fact, the doctor provided to plaintiff by Shell recommended to Shell that plaintiff “would have difficulty maintaining this position [driving a gasoline truck] at this time. The demands on his knee may be too overwhelming for him to be able to participate in those activities. I would recommend that he consider alternative work duties on a full-time basis for the future.” In addition to Dr. Levin’s comments, Shell has stated in response to plaintiffs interrogatories, that plaintiff was placed on long term disability in November 1992 after Dr. Levin advised that plaintiff was “not capable of performing the essential functions of the job as a truck driver.” Based on this evidence, the court finds that a question of fact exists regarding whether plaintiff is substantially limited in the major life activity of working, making summary judgment on this issue inappropriate.
 

 Best v. Shell Oil Co.,
 
 1995 WL 330764 at *3 (N.D.Ill. May 30,1995).
 

 After Judge Holderman’s ruling, the case was reassigned to Magistrate Judge Bobrick for trial by consent of the parties under 28 U.S.C. § 636. At a July 12, 1995, status hearing, Magistrate Judge Bobrick stated that he was interested in reconsidering Shell’s motion for summary judgment on the ADA claim. Two days later, the court notified counsel that the motion would not be reconsidered, and trial preparation continued. Again shifting course, however, the court, in an order of September 13, 1995, vacated the scheduled trial date of October 30, 1995, and ordered counsel to re-brief Shell's motion for summary judgment. Shell filed an amended motion for summary judgment with a supporting memorandum and fact statement, but Best filed nothing. Before this court, Best has represented that he elected to stand on his memorandum and fact statement of December 1994, but this was apparently unclear to Magistrate Judge Bo-brick, who noted in footnote 1 of his order that Best had not only missed the deadlines for filing his response to Shell’s renewed or amended motion, but he had also, without any explanation, failed to appear at a status conference set for November 30. As a result, Magistrate Judge Bobrick deemed Shell’s statement of facts to be admitted, and on that basis, he granted Shell’s motion. This appeal followed.
 

 Ill
 

 Best begins by arguing that Magistrate Judge Bobrick’s decision to re-open Shell’s motion for summary judgment violated the law of the case, which had been established in Judge Holderman’s earlier ruling. We are dealing here with the variant of the law of the case doctrine that relates to the re-examination of a prior ruling by a different member of the same court, as opposed to a judge’s reconsideration of her own earlier ruling, or a lower court’s obligation to honor the mandate of a superior court within a single judicial system. See generally 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 at 788 (1981). As this court explained in
 
 Williams v. C.I.R.,
 
 1 F.3d 502 (7th Cir.1998), the law of the case doctrine in these circumstances reflects the rightful expectation of litigants that a change of judges mid-way through a ease will not mean going back to square one. See also
 
 Christianson v. Colt Industries Operating Corp.,
 
 486 U.S. 800, 816-17, 108 S.Ct. 2166, 2177-78, 100 L.Ed.2d 811 (1988). Although the second judge may alter previous rulings if he is convinced they are incorrect, “he is not free to do so ... merely because he has a different view of the law or facts from the first judge.”
 
 Williams,
 
 1 F.3d at 503. Instead, the presumption is that earlier rulings will stand, even though it can be overcome for. compelling reasons (such as new controlling law or clear error). See
 
 Avitia v. Metropolitan Club of Chicago, Inc.,
 
 49 F.3d 1219, 1227 (7th Cir.1995) (the doctrine of law of the case establishes a presumption that prior rulings will stand as the suit progresses, but the presumption is not a straitjacket);
 
 Peterson v. Lindner,
 
 765 F.2d 698, 704 (7th Cir. 1985).
 

 When we translate these principles to the present situation, where we have before us two rulings by different members of the same court, an additional consideration is important. When the standard of review for the decision at issue is
 
 de novo,
 
 as it is on an
 
 *-1037
 
 appeal from a ruling on summary judgment, we need only ask whether the first judge made a correct ruling. See
 
 Williams,
 
 1 F.3d at 508. If the second judge was presented with precisely the same question in precisely the same way, then a decision that the first judge was correct necessarily means that the second judge was wrong, and vice versa. The situation is more complex if the second ruling was not in the same posture as the first. A renewed motion for summary judgment, for example, may be supported by additional evidentiary material that may have convinced even the first judge to rule the same way the second judge has now ruled. In such a ease, we would need to ask whether this new evidence (or other significant development) gave, the second court a compelling reason to reopen the previously decided question; if so, we would then review the second judge’s decision
 
 de novo,
 
 but if not, we would again take the first judge’s decision as our point of reference. Finally, as we noted in
 
 Williams,
 
 if both rulings concerned a discretionary matter, then law of the case principles indicate even more strongly that the court of appeals should defer to the first judge’s ruling.
 
 Id.
 
 at 503-04. This is because the second judge would have abused his discretion in reopening this kind of ruling.
 

 Magistrate Judge Bobriek was well aware that considerations of law of the case had to inform his decision to allow Shell to file another motion for summary judgment. He conceded that it amounted to Shell’s seeking “a reversal of Judge Holderman’s ruling.” Without further explanation, he concluded that the motion was appropriate because Best would not suffer
 
 “undue”
 
 harm from such a change. (This seems like a rather unrealistic description of the consequences for Best, since the reversal of Judge Holder-man’s ruling meant complete defeat in the lawsuit for him, rather than an opportunity to convince a jury of the merits of his claim.) If this were all we had to go on,
 
 Williams
 
 would require us to go back to Judge Holder-man’s ruling and ask whether he correctly denied summary judgment on Best’s ADA claim. Here, however, we have the additional complication noted above of a record that was not identical for the two motions.
 

 At oral argument, we inquired of both counsel to what extent the amended motion considered by Magistrate Judge Bobriek was different from the motion presented to Judge Holderman, either in legal theory, or in evi-dentiary support, or both. We were assured that the supporting materials were far more voluminous at that later stage, and our own review of the record confirms this. If this were true, then the additional evidence might have provided , Magistrate Judge Bobriek with the compelling reason he needed to reopen the earlier decision. Unfortunately, it is difficult to tell from his order whether the new evidence met this strict standard.
 

 One additional problem makes our task more difficult. Best, who submitted materials in opposition to the first motion for summary judgment, failed entirely to respond to the second motion. Thus, Magistrate Judge Bobriek actually had far
 
 less
 
 before him when he ruled than Judge Holderman had seen, even though Shell may have fleshed out its side of the story in more detail. As noted above, Magistrate Judge Bobriek resolved this problem by looking solely to the facts Shell presented and taking them as admitted by Best, which Local Rule 12(N)(3)(b) normally entitles the judge to do. If Best had filed even a brief statement informing the Magistrate Judge that he was relying on his earlier submissions to Judge Holderman, he might be entitled to the benefit of the doubt. Here, however, there is no excuse for his utter failure to respond to the amended motion. Due to Best’s decision to ignore the second motion (including any appropriate argument about law of the ease), we think it best to approach this case on the basis of the record as it stood before Magistrate Judge Bobriek. We-do so notwithstanding.our concern that Magistrate Judge Bobriek appears not to have applied a test consistent with the
 
 Chñstianson
 
 and
 
 Williams
 
 rules governing earlier decisions by a different judge of a tribunal at the same hierarchical level.
 

 As both Judge Holderman and Magistrate Judge Bobriek recognized, in order to recover under an ADA “failure reasonably to accommodate” claim, Best had to show (1) that he “was or is disabled” as defined by the
 
 *-1036
 
 Act, (2) that Shell was aware of this disability, and (3) that he was “qualified” for the position in question.
 
 Bultemeyer v. Fort Wayne Community Schools,
 
 100 F.3d 1281, 1284 (7th Cir.1996). See also
 
 Bombard v. Fort Wayne Newspapers, Inc.,
 
 92 F.3d 560, 563 (7th Cir.1996) (applying the two-step inquiry for determining when an individual with a disability is “qualified”). The two judges here disagreed with respect to first of these elements: Best’s status as a “disabled” person under the Act. The ADA defines a “disability” as:
 

 (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
 

 (B) a record of such an impairment; or
 

 (C) being regarded as having such an impairment.
 

 42 U.S.C. § 12102(2). Major life activities, as we recently explained in
 
 Knapp v. Northwestern University,
 
 101 F.3d 473, 479 (7th Cir.1996), are defined broadly to include “basic functions of life ‘such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.’ ” Cf. 29 C.F.R.Pt. 1630, App. § 1630.2(i), referring to 34 C.F.R. § 104. The precise question here is whether Best’s impaired knee substantially limited the major life activity of working, or if it simply prevented him from performing one narrow job for one employer.
 

 Shell argues that the evidence shows only that Best could not drive Peterbilt trucks with a particular clutch configuration, but that he was able easily to work as a truck driver in other kinds of vehicles. This compels a finding, it asserts, that Best’s disability did not interfere with a major life activity, and thus that he was not a “qualified individual with a disability” within the meaning of the ADA. Looking only at the facts Shell presented in. its amended motion for summary judgment (which it reprinted in numbered paragraphs in its brief before this court), we find, as Judge Holderman did, that there is more here than Shell’s interpretation of its own facts might suggest. First, Shell concedes that Best’s knee was injured and that the injury made it painful for him to drive Shell’s trucks with a clutch. (Facts 10, 17-18.) Second, Shell concedes that it accommodated Best’s physical impairment by replacing the Peterbilt seat in his vehicle with a Mack seat, and that this accommodation appeared to address the problem. (Facts 21, 22.) Third, Dr. Levin, who had been chosen by Shell itself to evaluate Best, “concluded that Best “would have difficulty maintaining this position at this time,’ ” and Dr. Levin “recommended that Best consider
 
 alternative work duties on a fulltime basis for the future.”
 
 (Facts 26, 27.) (Emphasis added.) Fourth, during a Driver Performance Evaluation performed by Jose Sotelo, Sotelo told Best that “he felt Best was not safe and
 
 should not be driving.”
 
 (Fact 28.) (Emphasis' added.) Fifth, Plant Manager Jack Bowman told Best that “Dr. Levin had stated that Best’s knee would not take the long hours of abuse required by the job
 
 and that Best should find another line of work.”
 
 (Fact 30.) (Emphasis added.)
 

 Even though Shell has included other facts in its statement that, if believed by a trier of fact, would indicate that Best was capable of handling all driving jobs except the one he had previously held at Shell, we believe that the points we have emphasized above were enough to raise a genuine issue of fact on the impact of his injury on the major life activity of working. It is important to remember that we must view the record in the light most favorable to Best. A reasonable trier of fact could find that Best’s bad knee substantially limited his ability to work as a truck driver. (That same trier of fact could also find that Best remained qualified to perform the job with reasonable accommodations, since the accommodations Shell offered appeared to have been quite successful.) The record does not show, at the present, how many truck driving jobs require the ability to operate a truck with a clutch or how often the painful configuration of the Peterbilt seat occurs, but the statements irom Dr. Levin and Mr. Sotelo suggest that this is not uncommon. Even taking Shell’s facts at face value, a trier of fact could find that Shell perceived Best as having a disability that prevented him from working as a truck driver for the company. It was Shell, after all, who placed Best on long term dis
 
 *-1035
 
 ability and looked for a non-driving job Best could perform. Only when Shell told him there were no such jobs and placed him on leave without pay did Best finally resign from the company.
 

 This was enough, even given Best’s inexcusable failure to respond to Shell’s motion, to require a trial. In fact, despite Shell's protestations that the record was so much more developed before Magistrate Judge Bo-brick, we see little that materially added to the record before Judge Holderman. Looking at much the same evidence Shell concedes is in the record, Judge Holderman correctly concluded that a question of fact existed about whether Best was substantially limited in the major life activity of working. We regret the delay in these proceedings occasioned by the ruling on the amended motion for summary judgment, some of which is no doubt attributable to Best’s uncooperative behavior at the time. Nevertheless, we conclude that the judgment on the ADA claim must be Reversed and the case RemaNded for further proceedings consistent with this opinion. Each party is to bear its own costs on appeal.