**Barbara DAVIDSON, Plaintiff–Appellant,**

**v.**

**MIDELFORT CLINIC, LTD.,
Defendant–Appellee.**

No. 96–2860.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1997.

Decided Jan. 7, 1998.

500

Robert J. Gingras, Paul A. Kinne (argued),
Madison, WI, for Plaintiff–Appellant.

Donald K. Schott (argued), Fred Gants, Quarles & Brady, Madison, WI, Lauri D. Morris, Madison, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

The Midelfort Clinic in Eau Claire, Wisconsin terminated Barbara Davidson from her position as a psychotherapist, citing among her principal deficiencies her backlog of dictation. Davidson filed suit under the Americans with Disabilities Act, contending that as a result of Adult Residual Attention Deficit Hyperactivity Disorder ("ADD"), she has a "disability" as the ADA defines that term and that Midelfort refused to reasonably accommodate that disability. *See* 42 U.S.C. § 12112(b)(5)(A). She also claimed that Midelfort discharged her in retaliation for filing a claim of discrimination with the EEOC. *See* 42 U.S.C. § 12203(a). The district court entered summary judgment in favor of Midelfort. Because we conclude that Davidson has presented sufficient evidence that she has a "record" of a substantially limiting impairment, we reverse the judgment in part and remand for further proceedings. We otherwise affirm the judgment below on the disability claim for lack of evidence that Davidson presently has a substantially limiting impairment resulting from ADD or that Midelfort regarded her as having such an impairment. Because Davidson has not identified sufficient evidence of a causal link between the filing of her original charge of discrimination and her subsequent termination, we also affirm the entry of summary judgment on the retaliation claim.

## I.

We accept the following facts as true for purposes of reviewing the grant of summary judgment.

Midelfort hired Davidson on August 31, 1993 and assigned her to work with a "child and adolescent team" that the clinic was forming at that time, in part to serve youths who, like Davidson, have ADD. Davidson earned a master's degree in psychology from the University of Wisconsin–Stout in 1990 and is a licensed school psychologist and counselor. Before commencing her employment with Midelfort, Davidson had worked as a psychologist and crisis counselor for the River Falls, Wisconsin school district and as a therapist for St. Croix Psychological Services, also in River Falls.

When she interviewed for the job with Midelfort, Davidson disclosed that she herself suffers from ADD, a chronic psychological disability resulting from a biochemical imbalance. The disorder can interfere with one's cognitive processes, including the ability to concentrate, to learn, to organize one's thoughts, to verbalize them, and to formulate explanations. People who have ADD are often hyperactive, impulsive, and susceptible to distraction. Although Davidson was not formally diagnosed as having ADD until 1992, she has struggled with the disorder for many years.

Throughout her secondary and post-secondary education, ADD imposed obstacles to learning that Davidson managed to circumnavigate through hard work, adaptive techniques, and help from her professors. Because she was easily distracted, for example, Davidson found it difficult to concentrate in the classroom and required much more time than her peers needed to read and study. She attended a private high school, where she had the benefit of extensive individual tutorial assistance from her teachers and flexible deadlines for her assignments. The same degree of one-on-one help from her professors and flexibility with deadlines characterized her undergraduate and graduate education. Davidson also succeeded in developing certain techniques that compensated for the limitations resulting from ADD. For example, Davidson sat in the front row during lectures in order to avoid distraction. She would later tape record her notes and then transcribe them into writing, using the repetition and kinesthetic effort to commit them to memory. Likewise, when she read new material, Davidson often found it necessary to write out an entire passage she had just read in order to be able to organize the

information mentally. Given the extensive time she devoted to study outside of class, Davidson often found that she could not keep up with the workload and was periodically forced to withdraw from classes. She nonetheless attained a grade point average of 3.87 on a 4.0 scale in her graduate course work, although Davidson characterizes that as merely an "average" GPA.

Davidson's references from her first postgraduate employment speak in glowing terms of her counseling abilities and her devotion to the work. According to Davidson, she succeeded in her positions with the River Falls school district and the St. Croix clinic because her supervisors viewed her frequent questions as a strength and provided her with the structured work environment that she needed. She also notes that she worked long hours to compensate for her ADD.

As Davidson recounts events, however, the Midelfort Clinic was not so accommodating. Her immediate supervisor at Midelfort was Colleen Skold, the manager of behavioral health services. One may infer from the record that the relationship between Skold and Davidson was never a warm one. According to Davidson, when as a new employee she questioned Skold about clinic policies and procedures, Skold would become impatient, admonishing her to "make it short" or to take her inquiries to other therapists. When Davidson did pose questions to her colleagues, they told her that it was Skold's responsibility to provide orientation. Skold in turn criticized Davidson as being "intrusive," "impulsive," and "immature," and told her that she "smiled too much."

Davidson also cites a number of remarks and actions by Skold which, although susceptible of differing interpretations, could be read to bespeak a certain skepticism or negativity relating to ADD. For example, as Midelfort began to see increasing numbers of people with ADD among its clients, Skold observed that "the floodgates have opened"

and that people with ADD might unduly tax the clinic's resources. She expressed displeasure with the fact that people with ADD also accounted for a disproportionate share of the clinic's missed appointments. Yet, she also rejected the suggestion that the staff be permitted to telephone reminders to ADD clients in advance of their appointments, even when someone pointed out that problems with schedule organization went hand in hand with ADD; Skold believed that ADD clients should instead "take responsibility for their disabilities." Finally, although Davidson had been told at the outset of her employment at Midelfort that it would be appropriate for her to discuss her own experience with ADD to clients and staff, Skold later told Davidson that she talked about it too much.[1]

Soon after she began work at Midelfort, Davidson found herself falling behind on her dictation. Therapists at Midelfort were apparently required to dictate their patient notes for transcription by other staff members and inclusion in the patient's file. ADD makes it more difficult for Davidson to organize her thoughts without first writing them down on paper, so Davidson's solution was to write out her notes before dictating them, an obviously time-consuming process. When Skold found out that Davidson was frequently working late, she admonished her not to work after hours because the custodial staff had expressed concern. Davidson subsequently learned from the custodians, however, that they had voiced no objection to her hours and that other therapists routinely worked late. When Davidson mentioned her difficulty to a colleague, Sandra Hanson, Hanson told her that when she had trouble keeping up with her dictation in the past, Skold had ordered her a portable Dictaphone that she could use at home. But when Davidson approached Skold to request that she be given a portable Dictaphone, Skold refused. When Davidson later repeated the request, Skold told her that she had dis-

---

1. According to Davidson, Skold was also dismissive when fumes from the glue used to install new carpeting in the clinic in December 1993 caused Davidson to become ill. When Davidson told Skold of the reaction she was having to the fumes, Skold responded, "Maybe it's your ADD."

When other employees voiced similar complaints, Skold accused Davidson of having solicited them to do so. Ultimately, the clinic's response to Davidson's complaints was to give her a second office in the basement that lacked a telephone or file cabinet.

cussed the matter with human resources director Donna Marten, who had wondered aloud whether Davidson's request was just an "excuse." Skold told Davidson that she agreed with Marten that it was. When Davidson explained to Skold that she wrote out her notes as a way to compensate for her ADD, Skold observed that "successful therapists do not need to write out their dictation." [2]

In January 1994, Skold gave Davidson a written evaluation criticizing her for her not being organized, submitting her dictation late, and working overtime. Davidson told Skold that these were problems resulting from ADD and asked for Skold's assistance in formulating accommodations. Skold has admitted, however, that she made no effort to accommodate Davidson's ADD. She did not, for example, consult with other professionals at Midelfort (two of whom treated Davidson) to determine what accommodations might be made. She did not believe it incumbent upon her to do anything that would accommodate Davidson's disability. Indeed, she had no interest in even knowing whether ADD was the explanation for Davidson's performance shortcomings.

In the Spring of 1994, Davidson took her concerns to Marten, the director of human resources at Midelfort. She told Marten in February that Skold was ignoring her requests for accommodation. When in April, Davidson was given a six-month evaluation repeating the criticisms that Skold had made in January, Davidson again asked that her disability be accommodated. According to Davidson, Marten was no more accommodating than Skold. Instead, Marten told Davidson that she was to blame for her own problems and suggested that she begin looking for employment elsewhere.

Matters deteriorated from there. In a memorandum dated May 6, 1994, Skold directed Davidson not to discuss "personal performance" with her colleagues and warned her that she faced termination if she did not comply. Davidson again approached Skold and sought accommodation; again she was rebuffed. Meanwhile, Skold reminded Davidson that she continued to be in arrears on her dictation and that she faced discipline, including termination, if she did not eliminate the backlog. On May 17, Davidson filed a complaint with the EEOC and the Wisconsin Equal Rights Division claiming that Midelfort had discriminated against her on the basis of her disability. After receiving a right-to-sue letter from the EEOC, Davidson filed this suit on August 1, 1995, alleging that Midelfort had violated the ADA by refusing to accommodate her disability. On October 13, Skold and Marten fired Davidson. According to Skold, the primary reason that Davidson was fired was her backlog of dictation—at the time of her discharge, Davidson was two weeks behind. Davidson subsequently amended her complaint in this litigation to add the charge that she was fired in retaliation for pursuing her rights under the ADA.

The district court ultimately granted summary judgment in favor of Midelfort. *Davidson v. Midelfort Clinic, Ltd.*, No. 95–C–0551–C, Opinion and Order (W.D. Wis. June 26, 1996) (Crabb, J.). The shortcoming that the court discerned in Davidson's disability claim was the lack of evidence sufficient to raise a question of fact as to whether she was "disabled" as the ADA defines that term. Davidson argued that she had an impairment, ADD—and alternatively that she had a "record of such an impairment"—which substantially limited the major life activities of working, speaking, and learning; but the court concluded that Davidson's proof did not establish a significant restriction upon any of these three activities. With respect to her ability to work, Davidson had not shown that ADD rendered her unable to perform either a class of jobs or a broad range of jobs in various classes. At most,

---

**2.** We note that along with its reply memorandum in support of the motion for summary judgment, Midelfort proposed additional facts indicating that by April 1994, Davidson was in fact dictating at home. R. 36 at 3 ¶ 9; *see also* R. 39 at 4 ¶ 15. Given that these facts were proposed at the close of briefing, Davidson did not respond to them. Because the facts that Davidson herself proposed in opposition to the summary judgment motion indicate that Midelfort never accommodated Davidson in this way, we have assumed that Midelfort did not provide Davidson with a portable Dictaphone that she could use at home.

Davidson had presented evidence that she had difficulty performing one aspect (dictation) of her job at Midelfort. *Id.* at 13–15. With respect to her speaking ability, Davidson had no speech impediment and concededly was able to communicate effectively with her clients and colleagues. The difficulty that she alleged was one with her cognitive processes that made it difficult to formulate explanations and to dictate her notes, for example. In that respect, however, the court found no proof that the difficulty Davidson experienced was more severe than the trouble an average person might have. *Id.* at 16. Although Davidson alternatively asserted that ADD had historically limited her ability to learn, the court found no proof that she continued to experience that difficulty or that ADD hampered her ability to learn in the workplace. *Id.* at 17–18. The court also rejected Davidson's alternative claim that she was perceived as having an impairment by virtue of having ADD. Even if Davidson could show that her employer perceived her as unable to perform a particular aspect of her employment (*e.g.*, dictation) at Midelfort, she had no evidence that the defendant perceived her as having the kind of impairment that would amount to a substantial limitation on a major life activity-that would bar her from more jobs than her position at Midelfort, for example. *Id.* at 19–21. Finally, the court also found Midelfort entitled to summary judgment on the retaliation claim for want of proof of a causal connection between the filing of Davidson's discrimination charge and her termination five months later. *Id.* at 24–26.

## II.

Because this case was resolved against Davidson on summary judgment, our account of the facts has been favorable to her. *See Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). Accepting those facts as true, and granting Davidson the benefit of every reasonable inference that can be drawn from them, we must decide de novo whether a reasonable factfinder could find in Davidson's favor consistent with the terms of the ADA and the regulations that the EEOC has promulgated under that statute. *See id.* Although we owe Davidson the obligation to

examine the record in the light most favorable to her, our indulgence extends no further than the record before us. Once Midelfort made the preliminary showing that there was no dispute of material fact compelling a trial, the burden was Davidson's to identify evidence to the contrary. FED.R.CIV.P. 56(e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir.1994); *see also Venters*, 123 F.3d at 962. If she did not meet that burden, we must affirm the grant of summary judgment against her even if a different or more developed record might have entitled her to a trial. *See* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2739, at 521–22 & n. 14 (2d ed.1983); *Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 453–54 (7th Cir.1994); *American Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, 633 F.Supp. 201, 228 (N.D.Ill.1986) (Shadur, J.).

To recover under the ADA, the plaintiff must be "disabled." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). The ADA defines the "disability" of an individual as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see* 29 C.F.R. § 1630.2(g). "Major life activities" include the "basic functions of life" (*Knapp v. Northwestern Univ.*, 101 F.3d 473, 479 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997)), "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" (29 C.F.R. § 1630.2(i))—those rudimentary activities "that the average person in the general population can perform with little or no difficulty" (29 C.F.R. Pt. 1630, App. § 1630.2(i) (Interpretive Guidance)). As the statute indicates, an impairment rises to the level of a disability for purposes of the ADA if it "substantially limits" one or more of these activities. Thus, not every impair-

ment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test. *Roth*, 57 F.3d at 1454.

Resolution of this case turns on the extent to which ADD can be said to limit one or more of Davidson's major life activities. In the attempt to show that she has a "disability" as the ADA uses that term, Davidson has invoked each of the three alternative definitions set out in § 12102(2). She contends, in other words, that she has a substantially limiting impairment, that she has a record of such an impairment, and that she was regarded as having such an impairment. There is no dispute that ADD qualifies as an impairment for purposes of the statute. *See* 29 C.F.R. § 1630.2(h)(2). There is also no dispute that Davidson presently has ADD, that she has had ADD for years, and that Midelfort was aware of her ADD. What is disputed is whether, for purposes of §§ 12102(2)(A) and 12102(2)(B), ADD does impose or has imposed a significant limitation on any of the three major life activities that Davidson has identified—working, speaking, and learning—or, for purposes of § 12102(2)(C), whether Midelfort regarded Davidson's ADD as disabling in these ways.

A. *Section 12102(2)(A): substantially limiting one or more major life activities*

As we have noted, an impairment must substantially limit a major life activity before it may be deemed a disability for purposes of the ADA.

■ The term "substantially limits" means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activ-

ity as compared to an average person in the general population.

*Roth*, 57 F.3d at 1454 n. 12; 29 C.F.R. § 1630.2(j)(1)(i) and (ii); *see also Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 961 (7th Cir.1996).[3] Like the district court, we must therefore consider whether there is sufficient evidence in the record from which the factfinder could conclude that ADD imposes significant restrictions on Davidson's ability to work, to speak, or to learn.

1. Working

■ To demonstrate a significant limitation on her ability to work, it is not enough for the plaintiff to show that her impairment "prevented [her] from performing one narrow job for one employer." *Best v. Shell Oil Co.*, 107 F.3d 544, 548 (7th Cir.1997); *see* 29 C.F.R. § 1630.2(j)(3)(i). She must show instead that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.*; *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir.1996).[4]

■ At most, the evidence in this case suggests as a result of ADD, Davidson was unable to perform her job at Midelfort. Davidson has come forward with no evidence from which one might reasonably infer that ADD precluded her even from holding other comparable positions as a therapist. Indeed, by her own account, the principal reason for Midelfort's decision to discharge her was her slowness in completing her dictation. Whatever importance Midelfort may have attached to timely dictation, that was only one aspect of Davidson's employment with Midelfort,

---

**3.** Factors that the court should consider in ascertaining whether an impairment imposes substantial limitations upon the plaintiff include (1) the nature and severity of the impairment, (2) the actual or expected duration of the impairment, and (3) the actual or anticipated permanent or long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2).

**4.** Factors that the court may consider in assessing the degree of limitation that an impairment imposes on the plaintiff's ability to work include (1) the geographical area to which the plaintiff

has reasonable access; and (2) the job from which the plaintiff has been disqualified because of the impairment and (a) the number and kinds of jobs in the plaintiff's geographical area utilizing comparable training, knowledge, skills or abilities from which the plaintiff is also disqualified because of his impairment, as well as (b) the number and kinds of jobs in the same area not utilizing comparable training, knowledge, skills or abilities but from which the plaintiff is nonetheless disqualified because of his impairment. 29 C.F.R. § 1630.2(j)(3)(ii).

and the record does not suggest that ADD imposed other limitations on her ability to function effectively in her role as a counselor.[5] *See Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 727 (5th Cir.1995) (citing *Chandler v. City of Dallas,* 2 F.3d 1385 (5th Cir.1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994)). Moreover, so far as the ability to dictate her notes is concerned, Davidson has made no showing that this is a skill that other counseling positions require. It strikes us as somewhat unlikely that *all* employers of psychotherapists demand that one's notes be dictated for transcription by other employees, particularly with computers becoming an omnipresent fixture in the workplace. We can only speculate about that, however, because Davidson has given us no evidence on this point. She has shown only that Midelfort required her to dictate her notes and deemed her competence in that regard to be subpar.

In the face of Midelfort's motion for summary judgment, Davidson needed to identify what requirements posed by the class of psychotherapy jobs (or alternatively, by a broad range of other jobs) were problematic in light of the limitations that ADD imposed on her. This is not an onerous requirement, but it does require at least some evidence from which one might infer that Davidson faced "significant restrictions" in her ability to meet the requirements of other jobs. In *Best,* for example, the evidence revealed that the plaintiff's knee injury not only made it difficult for him to drive the particular kind of truck that his employer used, but had prompted a doctor as well as a workplace evaluator to remark that he should look for a different line of work altogether. 107 F.3d at 548; *see also Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 911 (7th Cir.1996) (restrictions imposed by plaintiff's physicians "might apply to a broad range of jobs, and are more than job specific"; thus, a jury might conclude that the plaintiff's shoulder impairment substantially limited his ability to work). As the district court noted, there is nothing of

that order in the facts that Davidson has proposed, nor in the underlying evidence she has cited. Opinion and Order at 14. The closest thing to it are statements in Davidson's own affidavit asserting that she was able to succeed in her prior employment because her employers were willing to accommodate the particular needs and limitations that ADD imposed on Davidson. R. 33 at 3–4 ¶¶ 14–15. What is missing, however, is some evidence from which one might identify requirements common to counseling positions, for example, that Davidson would find it difficult to meet *without* accommodation.

### 2. Speaking

▪ Like the district judge, we are somewhat skeptical of the notion that difficulty in dictating one's notes by itself amounts to a limitation on one's ability to speak. As a life activity, speaking surely does entail more than the physical aspects of vocalization. What is noteworthy about the impediment that Davidson claims, however, is that it does not affect her ability to communicate generally. To cite an obvious example, speaking with her clients was obviously a fundamental component of Davidson's position with Midelfort, and yet the record reveals no limitations in this regard. Dictation, by contrast, represented a much narrower part of her job and an even smaller component of her life activities generally.

Even if we accept Davidson's argument that difficulty dictating amounts to difficulty speaking, it is not at all clear that Davidson's limitations vis à vis dictation could reasonably be considered to be a *substantial* limitation on her ability to speak. We venture to guess that many if not most people find no need to dictate in the course of their day-to-day lives. Given the lack of evidence in this regard, it is not even clear, as we have noted, how many counseling jobs require the ability to dictate. An inability to engage in a particular kind of speaking not employed by most people, and possibly not even by most work-

---

**5.** On the contrary, the letters of references from Davidson's previous employment with the River Falls School District speak in glowing terms of her work and ability. R. 24 Ex. A. Even Davidson's initial performance evaluation at Midelfort makes positive reference to her skills as a therapist (R. 39 Ex. 2 at 1); what criticisms were made in that regard appear unrelated to any impairment imposed by ADD (*see id.*).

ers in jobs comparable to the plaintiff's, is a dubious basis on which to claim a disability as defined by the ADA. *Cf.* 2 EEOC COMPLIANCE MANUAL ¶ 6884, § 902.4(c), at 5312 (1995) (Example 1) (knee injury that results in discomfort after walking eleven miles would not constitute substantial limitation on ability to walk, because average person in general population would be unable to walk eleven miles without some discomfort).

### 3. Learning

Section 12102(2)(A)'s definition of disability ("a physical or mental impairment that substantially limits one or more of the major life activities of such individual") is phrased in the present tense. In contrast, § 12102(2)(B)'s definition ("a record of such an impairment") looks to the past. *See* 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 902.7, at 5323–5324. The district court pointed out that although Davidson had asserted that ADD limited her ability to learn in high school, college, and graduate school, she had not presented evidence that ADD continued to "interfere[ ] with her ability to learn in the workplace." Opinion and Order at 17.

■ So far as the threshold showing of disability is concerned, we do not agree that Davidson necessarily had to show a workplace-related limitation. The statute requires proof of a limitation on one or more major life activities, and among the major life activities cited by the regulations is "working"; but nowhere do we find a requirement that limitations on other life activities—walking, for example—be shown to manifest specifically in the workplace before the plaintiff may be accorded disabled status under the statute. *See* 29 C.F.R. § 1630.2(h)(2)(i); 29 C.F.R. Pt. 1630, App. § 1630.2(j) (Interpretive Guidance) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working."); 2 EEOC COMPLIANCE MANUAL ¶ 6884, § 902.4(c), at 5312 (same); *see also Doane v. City of Omaha,* 115 F.3d 624, 628 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 693, —— L.Ed.2d —— (1997). In an accommodation case like this one, the relationship between the plaintiff's limita-

tions and the workplace will become relevant if and when the employer's duty to make reasonable accommodations is considered. *See generally* 42 U.S.C. §§ 12111(9), 12112(b)(5)(A). That question has not yet been reached in this litigation; summary judgment on Davidson's disability claim was instead sought and granted solely on the ground that she does not qualify as disabled. In this context, the fact that she has not offered proof of difficulty learning *in the workplace* is not dispositive.

■ The lack of evidence that ADD presently limits Davidson's ability to learn is more troubling. Although we agree with Davidson that there is enough evidence concerning her difficulties at school to permit the inference that she has had difficulty learning in the past, there is little or no evidence in the record establishing that ADD presently inhibits her capacity to learn. There are some references in record that arguably could be construed as evidence that Davidson had difficulty getting oriented when she came to Midelfort. Skold's apparent impatience with the questions that Davidson presented first to Skold and then to others at Midelfort might be taken as a sign that Davidson asked more questions that the average person would have done, although even Davidson's own affidavit does not posit a link between ADD and her need to ask the questions that Skold found annoying. There is, in addition, Davidson's own assertion that she succeeded at her previous employment because her superiors had supplied her with a structured environment and had viewed her questions as a strength. R. 33 at 3–4 ¶¶ 14–15. But we do not think these oblique references enough to establish that Davidson has ongoing, substantial limitations on her ability to learn outside of the academic setting. Certainly we would not expect that Davidson's learning-related limitations to have simply ceased when she attained her master's degree. No doubt there are many facets of Davidson's profession, for example, that require her to acquire and assimilate new information. But it would have been a simple enough task for Davidson to address this issue in her affidavit, and yet inexplicably she did not. Neither we nor the factfin-

der should be put in the position of having to speculate, particularly when the statute requires evidence not just of an impairment, but of a substantial impairment.

### B. *Section 12102(2)(B): record of impairment*

Davidson has also invoked § 12102(2)(B), arguing that she has a record of an impairment with respect to the major life activities of working, speaking, and learning. The district court rejected this theory summarily, reasoning that "[Davidson] has not established that she has an impairment that substantially limits a major life activity." Opinion and Order at 18. In other words, the district court rejected the "record of impairment" claim for the same reasons it had already rejected Davidson's claim under § 12102(2)(A) that she *presently* has a substantially limiting impairment. We agree that the evidence discloses no history of a substantial limitation on the activities of working and speaking, but the same cannot be said as to Davidson's history of learning-related limitations.

Section 12102(2)(B) extends the coverage of the ADA to persons who "ha[ve] a history of, or ha[ve] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). This would include people who have recovered from previously disabling conditions (cancer or coronary disease, for example) but who may remain vulnerable to the fears and stereotypes of their employers. 29 C.F.R. Pt. 1630, App. § 1630.2(k) (Interpretive Guidance); 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 907(a), at 5323–24; *see School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 1126–27, 94 L.Ed.2d 307 (1987) (Rehabilitation Act) (*quoting Southeastern Community College v. Davis*, 442 U.S. 397, 405–06 n. 6, 99 S.Ct. 2361, 2366–67 n. 6, 60 L.Ed.2d 980 (1979); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d at 1456–57. To this extent, § 12102(B) is a close sibling to the "perceived impairment" provision of § 12102(2)(C) (*see Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir.1995))) and naturally supports the kind of disparate treatment claim that the plaintiff brought in *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793 (7th Cir.1995). The reach of § 12102(2)(B) may also extend, however, to those who may require some kind of accommodation from their employer, notwithstanding their inability to demonstrate a present impairment that is substantial enough to qualify as disabling under the ADA. *See* 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 907(a), at 5323.[6] Thus, evidence of a *history* of a substantially limiting impairment *could* constitute a disability under the statute, permitting the plaintiff to demand reasonable accommodations to ongoing or recurrent limitations. *See generally Best v. Shell Oil Co.*, 107 F.3d at 547–48 ("in order to recover under an ADA 'failure reasonably to accommodate' claim, Best had to show [first] that he 'was or is disabled' as defined by the Act") (citing *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1284 (7th Cir.1996)); *see also, e.g., Arline*, 480 U.S. at 281, 107 S.Ct. at 1127 (Rehabilitation Act); *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1381–87 (3d Cir.1991) (Rehabilitation Act); *Mark v. Burke Rehabilitation Hosp.*, 1997 WL 189124, at *4

---

**6.** The precise scope of the "record of impairment" prong of the statute is not entirely clear as it relates to the right to demand reasonable accommodations of the employer. A person with a recurring condition—a flare-up of tuberculosis, for example—might be able to show that she qualifies as disabled under the ADA based on her previous hospitalization for that disease and is thus entitled to reasonable accommodation vis à vis any limitations that may result from the recurrence. *E.g., Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307. But does the employer incur a duty to accommodate an employee based on her history of a substantially limiting impairment, even if her current limitations are not substantial? If so, the "record of impairment" provision grants the ADA a significantly broader sweep than it would otherwise have. We need not address such questions at this juncture; the parties themselves have not. The only question raised here is the threshold question whether Davidson may claim protection under the Act by virtue of a present, past, or perceived impairment. The extent to which Midelfort may have been obligated to accommodate Davidson based solely on any record of impairment is not before us. That and any other questions raised by this provision of the statute are open for exploration on remand.

(S.D.N.Y. Apr.17, 1997) (ADA); *Mahoney v. Ortiz*, 645 F.Supp. 22, 24 (S.D.N.Y.1986) (Rehabilitation Act).[7]

■ Granting Davidson the benefit of the favorable inferences to which she is entitled at this stage of the litigation, we believe that she has presented enough evidence to raise a question of fact as to whether or not she has a "record" of an impairment that would qualify as a disability. It is undisputed that throughout high school, college, and graduate school, Davidson confronted impediments (later attributed to ADD) to her ability to learn—difficulties focusing in the classroom and assimilating new material, to cite two prominent examples. Beyond claiming broadly that she had to work much harder than other students in order to achieve the level of success that she did, Davidson has not, it is true, made an effort to demonstrate that her difficulty learning was more significant than the limitations an average student might experience. However, she has identified the ways in which her learning-related limitations manifested themselves, as well as the ways in which she compensated for them, with enough specificity that one can reasonably infer that her burdens were distinct from that of the average student. For example, we do not imagine that the average person in the general population finds it necessary to dictate one's school notes and then write them out again by hand, or to write out the passages she has just read in a textbook, in order to assimilate the information. A factfinder could reasonably conclude from the evidence before us that Davidson has a history of an impairment substantially limiting her ability to learn. *See* 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 902.7(b), at 5324.[8]

## C. Section 12102(2)(C): regarded as having an impairment

There is no question that Midelfort was aware that Davidson has ADD. Davidson herself disclosed that fact when she interviewed for the job at Midelfort, and the psychologist and psychiatrist that treated Davidson both worked at Midelfort. Given Midelfort's knowledge, and in view of the criticisms that Midelfort made of Davidson's performance—her late dictation, for example-Davidson argues that Midelfort regarded her as having a substantially limiting impairment. § 12102(2)(C).

■ Davidson's argument with respect to § 12102(2)(C) lacks the support of evidence suggesting that Midelfort regarded any impairment resulting from ADD to be substantially limiting. The focus of the argument is on the perception of her ability (or inability) to work: "Simply put, Midelfort regarded Davidson as unable to work, and treated [her] adversely because of it." Davidson Br. 32. We may assume, as Davidson contends, that Midelfort indeed did conclude that ADD rendered Davidson unable to fulfill her responsibilities at Midelfort. Skold had repeatedly criticized Davidson for her late dictation, for example, and given Davidson's entreaties for accommodation in that regard—all of them allegedly rejected (*but see* n. 2, *supra*)—Skold may have concluded that Davidson would never be able to complete her notes with the timeliness that Midelfort demanded. But even if Skold and Midelfort perceived this and any other shortcoming to be an impairment, nothing in the record suggests that Midelfort perceived the impairment as limiting her ability to work generally. As we have discussed,

---

**7.** In her brief, Davidson suggests that the diagnosis of ADD is alone enough to constitute a record of an impairment for purposes of § 12102(2)(B). Davidson Br. 20. In that assertion, she is mistaken. What § 12102(2)(B) requires is not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities. *See* 29 C.F.R. § 1630.2(k); 29 C.F.R. Pt. 1630, App. § 1630.2(k) (Interpretive Guidance); 2 EEOC COMPLIANCE MANUAL ¶ 6887, § 902.7(a), at 5323 (*citing Byrne v. Board of Educ.*, 979 F.2d 560, 566 (7th Cir.1992)).

**8.** We note that a "record of impairment" claim under § 12102(2)(B) requires proof that the employer was aware of the record in question. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(k) (interpretive guidance); *see also Best*, 107 F.3d at 547–48; *Roth*, 57 F.3d at 1457. Davidson disclosed that she has ADD when she interviewed for the job at Midelfort; however, the record does not reveal to what extent, if any, she discussed her history of learning-related difficulties. In any event, the parties have not addressed the point, and we leave that and any other question raised by this claim to be sorted out on remand.

§ 12102(2)(A) looks for proof beyond the plaintiff's inability to satisfy the expectations of a single employer; to be "substantial," a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA. For purposes of § 12102(2)(C), the employer's perception of the plaintiff's inability to work must have a comparable breadth. 29 C.F.R. § 1630.2(*l*);[9] 2 EEOC COMPLIANCE MANUAL ¶ 6888, § 902.8(f), at 5328; *see Byrne v. Board of Educ., School of West Allis–West Milwaukee*, 979 F.2d 560, 567 (7th Cir.1992) (Rehabilitation Act); *see also Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 806 (5th Cir.1997); *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir.1996), *cert. denied,* — U.S. —, 118 S.Ct. 630, — L.Ed.2d — (1997); *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir.1996); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995); *Cook v. Rhode Island, Dep't of Mental Health, Retardation & Hosps.*, 10 F.3d 17, 25 (1st Cir.1993) (Rehabilitation Act); *Forrisi v. Bowen*, 794 F.2d 931, 934–35 (4th Cir.1986) (same). A perception that ADD rendered Davidson unfit to work as a psychotherapist, for example, might bring her within the scope of 12102(2)(C). So far as the record informs us, that was not Midelfort's perception; the most that one can infer from the record is that Midelfort considered her unable to perform one job for one employer.

### D. *Retaliation*

 The ADA's proscription against retaliation, 42 U.S.C. § 12203(a), employs language comparable to that of Title VII, 42 U.S.C. § 2000e–3(a); and we therefore look to Title VII retaliation cases for guidance in assessing Davidson's retaliation claim. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997) (collecting cases). In the absence of direct evidence of a retaliatory animus, the plaintiff bears the initial burden of making out a prima case of retaliation; and among other things, that case requires proof of a causal link between the adverse action of which the employee complains (here, termination) and the employee's statutorily protected expression (in this case, Davidson's original charge of discrimination). *See Roth, supra*, 57 F.3d at 1459. Like the district court, we find no evidence reasonably suggesting that Davidson's charge had anything to do with her termination.

 The fact that Davidson's discharge occurred after she filed her charge with the EEOC does not by itself suggest a causal relationship between these events. A " 'telling' temporal sequence" can establish that nexus, *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir.1989), but by "telling" we mean that the employer's adverse action follows fairly soon after the employee's protected expression. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796–97 (7th Cir.1997). As the period of time separating the two lengthens, the hint of causation weakens. *Id. at* 797. Davidson's discharge occurred five months after she filed her charge of discrimination, and we have previously concluded that when so much time passes before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them. *See Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992) (four months); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (nearly six months). That is not to say that the plaintiff is precluded from making out a prima facie case of retaliation (*see Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n. 6 (7th Cir.1996)), but rather that additional proof of a causal nexus is necessary.

Beyond the fact that her discharge postdated her discrimination charge, Davidson

---

9. The regulation provides that an individual might be regarded as having an impairment if he:

 (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

 (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

 (3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*).

recites the evidence that she believes hints of a discriminatory animus harbored by Skold and others at Midelfort—Skold's disinterest in whether Davidson's performance problems were due to ADD, for example, and Skold's and Marten's shared view that her requests for accommodation were simply an "excuse."[10] Together, Skold and Marten made the decision to fire Davidson, and Davidson reminds us that in *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir.1994), we noted that it will often be inappropriate to decide on summary judgment that a discharge decision is untainted by any discriminatory or retaliatory motive when the evidence shows that an employee with a discriminatory animus supplied information or input that may have affected that decision. But *Dey* is of little help to Davidson. The key reason articulated for Davidson's discharge was her tardy dictation. That criticism was aired long before Davidson filed her discrimination charge, and indeed there is no dispute that Davidson *was* behind in her dictation. The whole thrust of Davidson's disability claim, in fact, is that she could not complete her dictation in a timely fashion without the kind of accommodation that Midelfort purportedly refused to give her. This is not a situation, then, in which the negative performance assessment is itself suspect because the evaluation may have been the product of bias rather than objectively verifiable information. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1176–77, 1178 (7th Cir.1997) (Diane P. Wood, J., concurring in part and dissenting in part). Again, Davidson might still be able to show some causal relationship between her charge and the subsequent decision to terminate

her, but she will require additional evidence before that inference can be drawn.

Davidson relies most heavily on a memorandum that Marten sent to Skold after the charge had been filed. In relevant part, the memorandum stated:

> We need to continue business as usual with Barb, calling attention to her performance problems as they surface, document, and continue to build a record of her performance/work habit problems. We should not acknowledge to her our receipt of this complaint, nor of the decision to contest her allegation.
>
> I am informing you of this action since you are involved in her supervision. During the course of this dispute we have been advised to not terminate Ms. Davidson's employment, even though upon review of her personnel records, our Attorney said it substantiates a performance problem. Termination of her employment at this point could be interpreted by an investigator or the courts as a result of her filing this complaint.

R. 28, Skold Dep. Ex. 11. What this reflects, Davidson argues, is not only Midelfort's lack of candor with her, but an ongoing campaign to build a record that would offer a fig leaf of legitimacy to the clinic's eventual decision to terminate her. But considered in context, the memorandum does not constitute evidence of retaliation in progress. Insofar as it acknowledges Davidson's charge, notes the need to continue to document her performance problems "as they arise," and counsels against termination, the memorandum is a fairly routine defensive response on the part of an employer to a pending charge of discrimination.[11] Nothing that Marten said can

---

**10.** We note that although Davidson argues that such evidence supports an inference of discriminatory animus, she has not pursued a claim that her discharge was discriminatory in the sense of being the result of a bias against her because she was disabled. *See* R. 30 at 17 ("[t]his is a *failure to accommodate* claim") (emphasis in original); *cf. Leffel v. Valley Financial Servs.*, 113 F.3d 787, 792 n. 4 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). *See* R. 30 at 17 ("[t]his is a *failure to accommodate* claim") (emphasis in original).

**11.** In her briefs as well as her proposed facts, Davidson has claimed that "[i]n the process of

terminating Davidson, Skold referred to Davidson's charge of discrimination." Davidson Br. 14; R. 31 at 15 ¶ 60. This averment makes it sound as if Skold cited the charge as a reason for firing Davidson. In fact, what Skold said in the cited passage of her deposition is that when she and Marten made the decision to terminate Davidson,

> We discussed the fact that we really had someone we should be terminating but because of the discrimination suit we really felt we needed to check with an attorney before we went ahead and made any steps toward that.

R. 28, Skold Dep. 10. Consistent with Marten's memo, Skold's testimony simply suggests that

reasonably be construed as a call to fabricate criticisms, or even to intensify or otherwise modify the manner in which Midelfort was monitoring and evaluating Davidson's performance.[12]

### III.

As our discussion reflects, the record contains evidence sufficient to permit the factfinder to conclude that Davidson has a history of an impairment that substantially limited her ability to learn and for that reason qualifies as a person with a disability for purposes of the ADA. We agree with the district court that the record does not adequately support the alternate grounds for disability that Davidson has pursued, and we affirm the grant of summary judgment to that extent. We also affirm the entry of summary judgment on the retaliation claim. However, because there remains a question of fact as to whether Davidson has a "record" of a disabling impairment, and because Midelfort's request for summary judgment on the disability claim was limited to the threshold question of whether Davidson has a disability cognizable under the ADA, we must reverse the grant of summary judgment in part and remand for further proceedings consistent with this opinion. The parties shall bear their own costs of appeal.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

she and Marten made the decision to terminate Davidson *despite* her pending discrimination charge, not *because of* that charge.

**12.** Davidson suggests briefly that Midelfort retaliated against her not only by firing her, but before that in refusing to accommodate her. But of course, by Davidson's own account, Skold and Marten had been refusing her requests for accommodation for quite some time prior to the filing of her discrimination charge. Davidson directs us to no evidence suggesting that her charge changed anything in that respect.