Loretta COLEMAN, Plaintiff,

v.

**KEEBLER COMPANY,**
**et al., Defendants.**

**No. 1:96–CV–407.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 26, 1998.

Denise K. LaRue, Lester H. Cohen, Haskin, Lauter, Cohen & LaRue, Indianapolis, IN, for Plaintiffs.

John W. Bowers, Stacey L. Katz, James P. Posey, Beers, Mallers, Backs and Salin, Fort Wayne, IN, for Keebler Company, defendant.

Patrick L. Proctor, Warsco and Brogan, Fort Wayne, IN, T. Russell Strunk, Warsco, Brogan and Strunk, Fort Wayne, IN, Theodore Thomas Storer, Warsco, Brogan and Strunk, Fort Wayne, IN, for O'Boisie Corporation, defendant.

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on the motion for summary judgment filed by Defendant Keebler Company ("Keebler") on December 1, 1997. On January 5, 1998, the Plaintiff, Loretta Coleman ("the Plaintiff"), filed her brief in opposition, and on January 20, 1998, Keebler filed its reply brief. Oral argument was heard on the motion on February 18, 1998.

The record before the Court consists of deposition excerpts of the Plaintiff ("Pl. Dep. at ____"), and Thomas Gates, Human Resource Manager at the Bluffton Snack Food Plant ("Gates Dep. ____"); the affidavits of Cathy Smith ("Smith aff. ____"), Viola Martinez ("Martinez aff. ____"), and Thomas Gates ("Gates aff. ____"); and various documentary exhibits.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., as amended by 42 U.S.C. § 1981(a) ("ADA"), and more particularly 42 U.S.C. § 12117.

For the following reasons, Keebler's motion will be DENIED in part and GRANTED in part.

### II. MOTION TO STRIKE AFFIDAVITS

■ The Plaintiff supported her response brief with the affidavits of two former Keebler employees, Viola Martinez ("Martinez"), and Cindy Smith ("Smith"). This drew a verified motion to strike under Fed.R.Civ.P. 37(e)(1) on January 20, 1998, in which Keebler argued that the Plaintiff violated Fed. R.Civ.P. 26(a) and (e)(1) by first failing to include the names of Martinez and Smith in her initial disclosures, and by then subsequently failing to supplement. In her Febru-

consenting.

ary 5, 1998, response, the Plaintiff countered by arguing that she had no duty to either list Martinez or Smith in her initial disclosures, and that she had no duty to supplement, particularly since Keebler was made aware of Martinez and Smith during the deposition of Gates.

Turning first to the question of the initial disclosures, it is apparent that the Plaintiff did not violate Fed.R.Civ.P. 26(a) because she was not made aware of the existence of Martinez and Smith until after her initial disclosures and after responding to Keebler's discovery requests.

However, as a general rule, Fed.R.Civ.P. 26(e)(1) imposes a duty upon litigants to supplement discovery disclosures if the party learns that "in some material respect the information disclosed is incomplete or incorrect and the additional or corrective information has not otherwise been made known to the other parties *during the discovery process or* in writing." Fed.R.Civ.P. 26(e)(1) (emphasis added). Of course, there is no question that the Plaintiff's discovery of Martinez and Smith renders the Plaintiff's initial responses materially incomplete. However, it is also uncontroverted that Keebler became fully aware of the identities of Martinez and Smith at the latest during Gates' deposition. *See* Def. Mot. to Strike at 3; Pl. Resp. to Mot. to Strike at 7.

The duty to supplement imposed by Fed. R.Civ.P. 26(e)(1) does not require an application of form over substance. *See* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2049.1 p. 604 (2d ed. 1994) ("FEDERAL PRACTICE AND PROCEDURE"). In fact, both the Advisory Committee and leading commentators indicate that the incidental discovery, particularly during a deposition, of information ordinarily subject to supplementation satisfies the Rule 26(e)(1) duty as sufficiently as a formal filing:

> The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect. There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, *as when a witness not previously disclosed is identified during the taking of a deposition* . . .

Fed.R.Civ.P. 26(e)(1) advisory committee's note to 1993 Amendments (emphasis added). *See also* FEDERAL PRACTICE AND PROCEDURE § 2049.1 p. 604 ("there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition"); 6 JAMES WM. MOORE, ET. AL, MOORE'S FEDERAL PRACTICE § 26.131[1] p. 26–299 (3d ed. 1997) ("The duty to supplement generally does not extend to disclosures made as part of deposition testimony.") While these authorities envision the usual scenario in which the deponent speaks for the first time the name of a new witness, there seems to be little reason to forge a different result when a potential witness is first disclosed in a deposition question itself, rather than in response to a deposition question. Therefore, when the Plaintiff brought the identities of Martinez and Smith to Keebler's attention during Gates' deposition, she effectively satisfied her Rule 26(e)(1) duty to supplement her initial discovery disclosures, and Keebler's motion to strike should therefore be denied.

However, even if it could be said that the Plaintiff failed in her duty to disclose, no different result would obtain. Rule 37(c)(1) only precludes a witness if the proponent of the evidence cannot show "substantial justification" for failing to timely produce the name of the witness, or that the failure was not harmless. Here, the fact that both witnesses were effectively disclosed during Gates' deposition (and also by co-defendant O'Boisie Corporation in its Rule 26(a) disclosures even before that) suggests that the Plaintiff was substantially justified in believing that no further disclosure was required.

Nevertheless, to the extent that Keebler believes that it has been harmed by this turn of events the Court will ameliorate any possible prejudice by allowing Keebler to depose Martinez and Smith prior to trial. Indeed, at this point no prejudice can really be shown because the Court's disposition of the instant

**1108**

summary judgment motion does not depend upon either affidavit.

## III. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are viewed in a light most favorable to the Plaintiff, the non-moving party.

On August 24, 1987, the Plaintiff submitted an employment application to Keebler at its Bluffton, Indiana, facility. On that application, the Plaintiff falsely stated that she had completed the twelfth grade of high school. (*See* Pl. dep. at 245.) The Plaintiff was nevertheless hired, and began her employment on January 15, 1988. While employed with Keebler she worked as a converter and as a packer. (*Id.* at 53, 63–64.)

In June of 1994, the Plaintiff took a medical leave of absence due to non-work related problems concerning "locked elbows" and arthritis. (*Id.* at 42–43, 152.)

On February 5, 1995, and while still out on medical leave, the Plaintiff bid on the position of fry packer and was awarded the position. The Plaintiff expected that she would be placed in that position when she was able to return to work, and Gates was aware of the Plaintiff's expectation. (Gates dep. at 144; Pl. dep. at 104.) Later, in April of 1995, the Plaintiff had surgery on both elbows. (*Id.* at 49.) This surgery apparently ended the Plaintiff's ability to perform her old job of converter. (*Id.* at 58–59.) Nevertheless, the Plaintiff remained on medical leave until July 6, 1995, and Gates approved all requested extensions for leave up to that date on the assumption that her disability continued. (Gates dep. at 68–69.)

On July 6, 1995, the Plaintiff was released to return to work subject to certain restrictions; a ten pound weight limitation for the left and the right arm and no repetitive pushing, pulling or twisting for either the left or right arm. (*See* Def. Mem. in Supp. exh. B.) Gates knew that the Plaintiff's physician had indicated that these work restrictions were "permanent." (Gates dep. at 93–94; Gates aff. ¶ 15.)

At about that same time, the Plaintiff presented her medical release to Keebler's personnel coordinator, Connie Innskeep, who told her that she could not return to work as there was nothing in the plant that the Plaintiff could do. (*See* Pl. dep. at 73–75.) The Plaintiff was not afforded the opportunity to speak to Gates and, despite her request, no copy of the fry packer job description was provided to her or her doctor. (*Id.* at 75–77, 299.)

Gates admits that the only reason the Plaintiff was not placed in the fry packer position was her medical restrictions. (Gates dep. at 86, 136.) The Plaintiff had the "seniority" to be placed in the position, which means that she "had the ability" to do the work. (*Id.* at 138.)

Shortly after this, during July of 1995, the Plaintiff contacted her union and requested that they file a grievance. (Pl. dep. at 78.) However, the grievance was denied on July 15, 1995, and the union failed to pursue the grievance through the final step of arbitration. (Gates aff. ¶ 27 & exh. O.) Gates contends that during the grievance, he spoke with the Plaintiff's union representative many times but that neither the Plaintiff nor her union representatives suggested any position that the Plaintiff could fill, other than the fry packer position, nor was any accommodation suggested that would allow the Plaintiff to perform the fry packer job. (*Id.* ¶ 28–30.)

On November 1, 1995, Keebler officially closed the Bluffton plant's operations and laid off all hourly employees due to the plant's impending sale. However, some employees were kept on the payroll to run tests to assure potential buyers that the plant could still produce snack food efficiently. (Gates Dep. at 23–24.) This scaled-down operation continued until the plant reopened under new ownership.[2] (*Id.* at 24–25.)

2. The new owner eventually became O'Boisie Corporation. Summary judgment was granted to O'Boisie on February 5, 1998. The events that transpired during O'Boisie's tenure are not relevant for the purposes of the instant summary judgment motion, and the Court will not recite the factual record relating to O'Boisie here. The reader may refer to the Court's February 5, 1998, Memorandum of Decision and Order for a discussion of these facts.

Keebler contends that the Plaintiff is not a qualified individual with a disability who, with or without reasonable accommodation, could perform the essential functions of the fry packer's job. Moreover, Keebler asserts that there were no other jobs at the plant which the Plaintiff was qualified to perform. Finally, Keebler argues that at the very least, it is entitled to summary judgment with regard to the Plaintiff's claims for reinstatement and an award of front pay because she lied on her employment application about her educational qualifications.

The Plaintiff contends that Keebler violated the ADA by refusing to place her in the fry packer position when she presented her return to work form in July 1995, because she had successfully bid on the position and was capable of performing the essential functions of the job despite her medical restrictions. Additionally, the Plaintiff contends that Keebler refused to engage in the "interactive process" with her to determine whether she could perform that job or any other.

### IV. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 455 (7th Cir.1996); *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson*, 477 U.S. at 249–51, 106 S.Ct. at 2511; *North Am. Van Lines, Inc.*, 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## V. DISCUSSION

### A. The ADA

■ As a preliminary matter we must first ascertain what type of ADA claim the Plaintiff is advancing. "Discrimination" as proscribed by the ADA[3] encompasses two distinct types: (1) disparate treatment, i.e. "treating a qualified individual with a disability differently because of the disability"; and (2) failure to provide a reasonable accommodation; i.e. "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." *Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997) (internal quotations and citations omitted); *see also Weigel v. Target Stores,* 122 F.3d 461, 464 (7th Cir.1997) (distinguishing between disparate treatment and reasonable accommodation claims); *Bultemeyer v. Fort Wayne*

*Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996) (same). Disparate treatment claims under the ADA may be established by direct evidence or the indirect *McDonnell Douglas*[4] burden-shifting method of proof, *see DeLuca v. Winer Industries,* 53 F.3d 793 (7th Cir.1995), but a claim alleging a failure to reasonably accommodate will, if proven, directly establish a violation of the ADA. *Bultemeyer,* 100 F.3d at 1283. To aid both the parties and the courts in sorting out ADA claims the Seventh Circuit has urged that "it is important for the plaintiff to be clear about the nature of the claim he or she is asserting." *Weigel,* 122 F.3d at 464.

■ Although not clear from the briefs, at oral argument the Plaintiff explained that she is pursuing both a reasonable accommodation claim under 42 U.S.C. § 12112(b)(5) for Keebler's failure to fulfill its duty to participate in the reasonable accommodation process, and a disparate treatment claim by alleging that Keebler in effect discharged her based on a disability in violation of 42 U.S.C. § 12112(b)(1). *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996) (plaintiff pursued both reasonable accommodation and disparate treatment claims). While these distinct claims do entail separate analytical frameworks, as discussed *supra,* a plaintiff must make a predicate showing that she is a "qualified individual with a disability" in order to successfully prosecute either type of ADA claim. *See, e.g., Sieberns,* 125 F.3d at 1022 ("No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that he was a 'qualified individual with a disability.' ") (citation omitted); 42 U.S.C. § 12112(a). Therefore, we must address this threshold issue before proceeding to the unique aspects of her two claims.

### B. Qualified Individual With a Disability

"A 'qualified individual with a disability' is defined, in relevant part, as: 'an individual

---

**3.** The pertinent part of the ADA provides:
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employ-

ee compensation, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

**4.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Sieberns*, 125 F.3d at 1022 (citation omitted); 42 U.S.C. § 12111(8). Both the "disability" and "otherwise qualified individual" inquires involve multi-factor tests, to which we now turn.

### 1. Disability

■ The ADA defines disability in three ways:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual,

(B) a record of such impairment, or

(C) being regarded as having such an impairment.

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 505 (7th Cir.1998) (citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)). "Major life activities" include the "basic functions of life," such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"; activities "that the average person in the general population can perform with little or no difficulty." *Id.* (citing, *inter alia*, 29 C.F.R. § 1630.2(i); 29 C.F.R. pt. 1630, app. § 1630.2(1) ("Interpretive Guidance")).[5] As the statute indicates, an impairment only rises to the level of a disability under the ADA if it "substantially limits" one or more of these major life activities. *Id.* " 'Substantially limits' means that the person is either 'unable to perform a major life function' or is 'significantly restricted as to the condition, manner, or duration' under which the individual can perform a particular major life function as compared to the average person in the general population." *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)).

The Plaintiff contends that her arthritic condition is a substantially limiting impairment, or in the alternative, that Keebler regarded her arthritis as such an impairment. There is no dispute that the Plaintiff's medical condition creates some degree of impairment; at issue is whether she has raised a genuine issue of material fact as to whether her impairment, or Keebler's perception of her impairment, rises to such a level that it constitutes a finding that the Plaintiff is "disabled" under the ADA.

### A. SECTION 12102(2)(A): SUBSTANTIALLY LIMITING ONE OR MORE MAJOR LIFE ACTIVITIES

The term "substantially limits" means that the individual is either unable to perform, or significantly restricted as to the condition, manner, or duration under which the individual can perform, a major life activity as compared to an average person in the general population.

*Davidson*, 133 F.3d at 506 (quoting, *inter alia*, 29 C.F.R. § 1630.2(j)(i) and (ii)). The Plaintiff asserts in her response brief that her arthritis substantially limits her in the major life activities of working and lifting. *See* Pl. Resp. Br. at 15–16.[6] Therefore, the record must reflect sufficient evidence from which the fact finder could conclude that the Plaintiff's arthritic condition imposes significant restrictions on her major life activities of working and lifting. *Davidson*, 133 F.3d at 506.

### i. Working

■ The Plaintiff herself has produced only scant evidence to show that her arthritic condition substantially limits her ability to work. The Plaintiff has the burden to show what requirements of the fry packer job were problematic in light of the restrictions her arthritis imposed upon her. *Id.* at 507. In other words, the Plaintiff is required to

---

**5.** The EEOC's Interpretive Guidance is the agency's *administrative interpretation of the ADA*, and while not controlling upon this Court, does "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citations omitted) (Title VII case); *Gile v. United Airlines, Inc.*, 95 F.3d

492, 497 (7th Cir.1996) (quoting *Vinson* ) (ADA case).

**6.** The Plaintiff's brief is not crystal clear on this point, but since she specifically discusses her limitations with regard to working and lifting, the Court will address them directly. *See* Interpretive Guidance § 1630.2(i) (including working and lifting as major life activities).

provide "at least some evidence from which one might infer that [she] faced 'significant restrictions' in her ability to meet the requirements" of not only the fry packer job, but a broad range of jobs. *Id.; see also Cochrum,* 102 F.3d at 911. The Plaintiff's only evidence on this score is her testimony that her arthritis prevents her from lifting heavy weights, stretching her arms out completely, and repetitive pushing, pulling, and twisting.[7] She fails to explain how these limitations affected her ability to perform the fry packer position; that is, she makes no showing that lifting heavy weights, stretching her arms, or repetitive pushing, pulling, and twisting are skills that the fry packer position requires.

However, this failure does not, as it did in *Davidson,* leave us to merely speculate on whether the Plaintiff's physical limitations prevented her from performing the fry packer's position, or a range of other related positions. *See Davidson,* 133 F.3d at 507, 509. Our ultimate inquiry question on summary judgment is: Does the record support a reasonable inference that could lead the jury to find that the plaintiff is substantially limited in the major life activity of working? On this record, the answer clearly is "Yes." Although the Plaintiff contends that she can perform the fry packer position without accommodation, substantial evidence exists, particularly in Gates' deposition, that this is merely a "brave front." That is, a reasonable jury could find that Plaintiff holds an admirable and ambitious view of her physical abilities, but in reality Gates' testimony is correct, and her physical limitations in fact preclude her from performing any of twelve different jobs within the Bluffton plant without reasonable accommodation.

This in turn creates a genuine issue of material fact as to whether the Plaintiff's

physical limitations are substantially limiting because the same facts that support the inference that the Plaintiff cannot perform any job within the Keebler plant also support the reasonable inference that she cannot perform a class or broad range of jobs. To counter this inference, Keebler argues that at most this record demonstrates that the Plaintiff is unable to perform a limited number of jobs within a salty snack factory, not that she is disabled from all factory work generally. Keebler also contends that the Plaintiff has not established that she is substantially limited in working under *Marschand v. Norfolk & Western Ry. Co.,* 876 F.Supp. 1528, 1538 (N.D.Ind.1995), *aff'd* 81 F.3d 714 (7th Cir. 1996), because she has not presented any evidence as to the actual number and types of jobs from which she is disqualified by her arthritis.

Keebler's reliance upon *Marschand* is misplaced. Not only is Keebler's interpretation of *Marschand's* holding unduly narrow, but it disregards more recent Seventh Circuit precedent that has ameliorated the stringent requirements articulated in *Marschand,* particularly *Best v. Shell Oil Co.,* 107 F.3d 544 (7th Cir.1997), and *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 911 (7th Cir.1996).[8] The fact that the jury may reasonably believe Gates when he states that the Plaintiff is physically unable to perform twelve different jobs within the plant supports a reasonable inference that the Plaintiff was physically unable to perform not only the twelve jobs within Keebler, but also a broad spectrum of factory jobs in general. Therefore, the Plaintiff has at least raised a genuine issue of material fact as to whether or not she is substantially limited in the major life activity of working under the ADA. *See Best,* 107 F.3d at 548 ("a trier of fact could find that Shell perceived Best as having a disability

---

7. The Plaintiff does argue that Gates' lay opinion that he believed the Plaintiff to be "disabled" is credible evidence of her disability. However, "disability" is clearly a term of art as used in the ADA, and thus the fact that Gates, or any other layman, may have described the Plaintiff as disabled "really means nothing." *Gray v. Ameritech Corp.,* 937 F.Supp. 762, 770 (N.D.Ill.1996). Similarly, Keebler's characterization of the Plaintiff as not disabled merely because the Plaintiff characterized herself that way is unpersuasive.

8. *See also Leslie v. St. Vincent New Hope, Inc.,* 916 F.Supp. 879, 885 n. 4 (S.D.Ind.1996) (disagreeing with *Marschand'* s holding that a plaintiff is required to present job market data evidence set out in 29 C.F.R. § 1630.2(j)(3)(ii) to show that a disability will significantly restrict her ability to perform a class or a broad range of jobs).

that prevented him from working *as a truck driver* for the company.") (emphasis added); *Cochrum*, 102 F.3d at 911 ("An individual is substantially limited in working if the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes.") (quoting Interpretive Guidance § 1630.2(j)).

### ii. Lifting

■■■ The Plaintiff also claims that she is substantially limited in her ability to perform the major life activity of lifting. While it is true that she is not required to show a workplace-related limitation to meet the threshold showing of disability, *see Davidson*, 133 F.3d at 508, she must still offer some evidence that her ability to lift has been limited by her impairment. However, the Plaintiff's only argument on this score is that the EEOC's Interpretive Guidance classifies her arthritis as a significant medical impairment, and classifies lifting as a major life activity. She has offered no factual evidence at all as to her lifting capabilities before or after the onset of her arthritis. Therefore, we cannot draw any meaningful conclusions from her present alleged inability to lift heavy weights. As the Seventh Circuit recently recognized:

> It would have been a simple enough task for [the Plaintiff] to address this issue in [an] affidavit, and yet inexplicably she did not. Neither we nor the factfinder should be put in a position of having to speculate, particularly when the statute requires evidence not just of an impairment, but of a substantial impairment. *Id.* at 508–9.

Therefore, we must find as a matter of law that the Plaintiff has not met her burden of proving that her arthritic condition substantially limits her in the major life activity of lifting.

### B. Section 12102(2)(c): Regarded as Having an Impairment

■■■ Congress designed the "regarded as" provision of the ADA to combat erroneous stereotypes that employers may have about impairments that are not, in and of themselves, substantially limiting. *See, e.g.,*

*School Bd. of Nassau Cty., Fla. v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) ("Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from the actual impairment."); *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 541 (7th Cir.1995). The ADA regulations describe three ways in which a plaintiff may establish that he or she was "regarded as" having a disability:

> (1) The individual may have an impairment which is not substantially limiting but is treated by the employer or other covered entity as constituting a substantially limiting impairment;
>
> (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward impairment; or
>
> (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantial impairment.

*Harrington v. Rice Lake Weighing Systems, Inc.,* 122 F.3d 456, 459–60 (7th Cir.1997) (citing 29 C.F.R. § 1630.2(*l*)). Clearly the third category is inapplicable because the Plaintiff's arthritis constitutes an impairment. The second category is not applicable because the record is devoid of any evidence indicating that "others." (i.e. customers or clients) [9] held discriminatory attitudes toward the Plaintiff because of her arthritic conditions. The first category is applicable, however, and demands that the Plaintiff provide evidence that Keebler perceived her to be substantially limited by her arthritis. *See id.* at 460.

■■■ There is no question that Keebler was aware of the Plaintiff's arthritis; she had been granted medical leave several times for that condition, Innskeep and Gates reviewed her medical restrictions when her doctor released her to return to work, and Gates recognized that those medical restrictions were permanent. The question is: Did Keebler perceive the Plaintiff's restrictions to be substantially limiting? The substantially lim-

---

9. *See* Interpretive Guidance § 1630.2(1).

iting inquiry under § 12102(2)(C) is comparable to the inquiry under § 12102(2)(A):

> ... section 12102(2)(A) looks for proof beyond the plaintiff's inability to satisfy the expectations of a single employer; to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA. For purposes of section 12102(2)(C), the employer's perception of the plaintiff's inability to work must have comparable breadth.

*Davidson,* 133 F.3d at 511 (citations omitted).

The Plaintiff's evidence that Keebler perceived her arthritis as substantially limiting is essentially identical to the evidence supporting the inference that she is substantially limited in working. She asserts that Gates compared her medical restrictions to not only the fry-packer job, but also twelve other job classifications, and concluded that she could not physically perform any available jobs within the plant. As discussed *supra,* the fact that Gates regarded the Plaintiff as unable to perform any job within the Bluffton plant at the very least creates a genuine issue of material fact as to whether Gates perceived the Plaintiff as unable to perform a class or a broad range of jobs. *Best,* 107 F.3d at 548; *Cochrum,* 102 F.3d at 911.

Even more to the point, after the Plaintiff applied for the fry packer position Gates engaged in what a reasonable jury could conclude was a superficial and perfunctory investigation into the Plaintiff's limitations, designed only to confirm his already preconceived notion that she was substantially impaired. This inference arises, at least in part, from the fact that Gates never provided the Plaintiff's physician with a copy of the fry packer job description. Indeed, allowing the Plaintiff's physician to examine the job description might have led the doctor to proclaim that the Plaintiff was indeed capable of performing the fly packer position. A rea-

sonable jury could conclude that Gates' failure to provide the Plaintiff's doctor with the fry packer job description evidenced a perception by him (and thus by Keebler) that the Plaintiff's arthritis substantially limited her ability to work. Therefore, we cannot say as a matter of law that Keebler did not perceive the Plaintiff as disabled.

### 2. Qualified Individual

The "otherwise qualified individual" inquiry is a two part test. The Plaintiff must demonstrate (1) that she has the prerequisites for the position (i.e. proper training, skills, and experience);[10] and (2) that he could perform the essential functions of the job with or without reasonable accommodations. *Hammer,* 955 F.Supp. at 925 (citing *Bultemeyer,* 100 F.3d at 1284). The parties dispute both the "essential function" and the "reasonable accommodation" components of the second factor. Keebler argues that the Plaintiff's restrictions, particularly her ten pound per arm weight restriction, precluded her from performing various essential functions of the fry packer job, which include lifting up to twenty pounds and performing constant repetitive motions of pushing, pulling, lifting, fingering, and grasping. The Plaintiff counters by arguing that she could perform the four major components of the fry packer job: hand packing, pickout, inspection, and palletizing. Specifically, the Plaintiff contends that her weight restriction is ten pounds for each arm, so that her total lifting capacity is twenty pounds, which equals the weight lifting maximum listed in the fry packer job description.[11] She also argues that her other physical restrictions, i.e., the limitations on repetitive motions, would not prevent her from performing the fry packer job. She supports her arguments with the fact that she has performed the fry packer job in the past, and thus has personal knowledge of both the demands of the fry packer job and her physical limitations.

---

**10.** There is no dispute that the Plaintiff possessed the required prerequisites for the fry packer position, and we will limit our analysis accordingly.

**11.** It appears that both parties agree that the job description accurately describes the functions of the fry packer position, and that the maximum

weight lifting requirement of the position is 20 pounds. *See* Pl. Resp. Br. at 29; Def. Reply Br. at 8. As we shall see, however, the written job description does not conclusively answer all relevant inquires into the essential functions of the fry packer position.

## A. ESSENTIAL FUNCTION

 The "essential function" of a job are those requirements that bear more than a marginal relationship to the job. Interpretive Guidance § 1630.2(n). Keebler argues that the ability to lift twenty pounds is an essential function of the fry packer job, and argues that the Plaintiff could not perform this task with or without accommodation. Physical criteria, such as the ability to lift heavy loads, are properly considered "essential functions" only if they are "necessarily and substantially related to a person's ability to perform ... the job." *Rios v. Indiana Bayer Corp.*, 965 F.Supp. 919, 922 (S.D.Tex. 1997).

Evidence of whether a particular function is essential includes, but is not limited to: (1) *the employer's judgement as to which functions are essential;* (2) *written job descriptions prepared before advertising or interviewing applicants for the job;* (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) *the work experience of past incumbents on the job;* and/or (7) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3) (emphasis added). This list is not meant to be exhaustive, no one factor should be granted more weight than any other factor, and above all, "whether a particular function is essential is a factual determination that must be made on a case by case basis." Interpretive Guidance § 1630.2(n). Applying these factors to the record before us, we cannot say as a matter of law that the ability to lift twenty pounds is an essential function of the fry packer position.

 At first blush, lifting bags of overflow product, which when full with individual bags of snack food apparently weigh upwards of twenty pounds, would appear to be a logical and essential function of the assembly-line nature of the fry packer position. However, upon closer examination neither the law nor the factual record is quite so clear. It is important to remember that the inquiry must be very fact specific, and "made on a case by case basis." *Id.* The case law provides many examples which, although not controlling on our decision, underscore the highly fact-specific nature of the inquiry.[12]

 Examining the relevant evidence as suggested by the regulations does not provide us with a definitive conclusion. Keebler does indicate that it considers lifting bags weighing twenty pounds an essential function of the job, and indeed, the fry packer job description lists twenty pounds as the maximum lifting requirement of the position. While the Court is not seeking to offer a play on words, this evidence is at least entitled to some weight that lifting twenty pounds is truly an essential function of the fry packer position. *See* 29 C.F.R. § 1630.2(n)(3)(i), (ii). However, the Plaintiff has experience performing the fry packer job, and as the record indicates, at least an inference arises that the fry packer has some discretion over how full (and thus how heavy) the overflow bags become. This leads to the further reasonable inference that the overflow bags may not in fact consistently weigh twenty pounds, and

12. *E.g., Stone v. City of Mount Vernon,* 118 F.3d 92, 99–101 (2d Cir.1997) (While the court "in no way suggest[s] that the essential duties of a firefighter do not normally include fighting fires, [the record indicates that] it would be entirely permissible for the fact finder to infer that the ability to engage in firefighting activities is marginal to [these firefighting positions]"); *Hall v. United States Postal Service,* 857 F.2d 1073, 1079–80 (6th Cir.1988) (In a Rehabilitation Act case, a genuine issue of material fact existed as to whether a 70–pound lifting requirement was an essential function for a Postal Service distribution clerk, despite the fact that the job description stated it was an essential function; "Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved"); *Sharp v. Abate,* 887 F.Supp. 695, 698–99 (S.D.N.Y.1995) ("On this record, the Court is constrained to hold that the question whether the supervision of inmates is an essential function of a correction officer raises a genuine issue of fact"); *Henchey v. Town of North Greenbush,* 831 F.Supp. 960, 966–67 (N.D.N.Y.1993) (question of fact exists as to whether heavy lifting is an "essential function" of the job of "laborer" for the town's Highway Department despite written job description stating that the worker must have the "ability to lift heavy weight"). *Compare Martinson v. Kinney Shoe Corp.,* 104 F.3d 683, 687 (4th Cir.1997) (Maintaining store security was an essential function of a shoe store salesman's job).

that consequently lifting twenty pound bags is not an essential function of the fry packer position. *See id.* § 1630.2(n)(3)(vi).

On this record we have evidence and reasonable inferences favorable to both parties. Although Keebler's argument has some appeal, the factual record is not sufficiently complete to warrant the granting of summary judgment on whether the lifting of twenty pound bags of overflow product is an essential function of the fry packer job. Moreover, as we shall see in the next section, a reasonable jury could conclude that the Plaintiff is actually capable of lifting twenty pounds, or that she could have done so with a modest and reasonable accommodation, if only Keebler had chosen to consider such an accommodation.

### B. REASONABLE ACCOMMODATION

The term "reasonable accommodation" includes, *inter alia,* job restructuring, the modification of work schedules, reassignment to a vacant position, and the acquisition or modification of equipment or devices. 42 U.S.C. § 12111(9). The plaintiff has the burden to show that a proposed reasonable accommodation would be effective in allowing him or her to perform the essential functions of the job. *Vande Zande,* 44 F.3d at 543. However "the employer has at least some responsibility in determining the necessary accommodation." *Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996). "The determination of a reasonable accommodation is a cooperative process in which both the employer and employee must make reasonable efforts and exercise good faith. The allocation of the responsibility may vary with the circumstances of a case, but the employer is never completely free of some measure of responsibility." *Feliberty v. Kemper Corp.,* 98 F.3d 274 (7th Cir.1996) (citing *Beck,* 75 F.3d at 1135–36). The regulations envision an "interactive process" in which both parties participate:

> [T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves

both the employer and the [employee] with a disability.

Interpretive Guidance § 1630.9 (Process of Determining the Appropriate Accommodation). In reviewing an alleged failure to accommodate, or a breakdown of the interactive process,

> [n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary ... [C]ourts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1012 (7th Cir.1997) (quoting *Beck,* 75 F.3d at 1135).

Keebler charges that plaintiff never asked for an accommodation, reasonable or otherwise, and therefore its accommodation duties under the ADA were never triggered. In the alternative, Keebler asserts that it properly discharged its accommodation duties by holding significant discussions with the Plaintiff's union pursuant to the grievance she filed with her union before proceeding with this lawsuit. The Plaintiff counters by arguing that Keebler's on-the-spot determination that she could not perform the fry packer job triggered the interactive process, that Keebler failed to engage in any interaction with her individually, and that her union was an insufficient proxy for Keebler's alleged accommodation negotiations.

[18] Keebler first contends that the Plaintiff never asked for a reasonable accommodation, and therefore Keebler's duty to engage in the interactive process was never triggered, relying on caselaw stating that "the employee cannot expect the employer to read [her] mind and know [she] secretly wanted a particular accommodation." *See Scheer v. City of Cedar Rapids,* 956 F.Supp. 1496, 1500 (N.D.Iowa 1997). Of course, *Scheer* is not a case where the employee failed to alert the employer to his need for an

accommodation, and indeed in that case the interactive process had begun and worked well for a period of time. *Id.* at 1501. More importantly, the Seventh Circuit has reached the opposite conclusion, holding that:

properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say "I want a reasonable accommodation," particularly when the employee has a mental illness. The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.

*Bultemeyer,* 100 F.3d at 1285. The regulations also indicate that the burden for initiating the interactive process sometimes falls to the employer, rather than the employee. *See* 29 C.F.R. § 1630.2(*o*)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation."). Therefore, the mere fact that the Plaintiff failed to ask for a reasonable accommodation is not fatal to her case as a matter of law. *See Erickson v. Bd. of Governors of State Colleges and Universities for Northeastern Illinois University,* 1997 WL 548030, at *6 (N.D.Ill. Sept.2, 1997) (*Bultemeyer* and 29 C.F.R. § 1630.2(*o*)(3) preclude defendant from arguing that the plaintiff's failure to request an accommodation is dispositive of her failure to accommodate claim).

 Moreover, this case does not present a scenario where a plaintiff has some latent disability of which the employer was unaware. *See, e.g., Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 931 (7th Cir. 1995) (ADA does not bind an employer who has not been informed of the disability and has no reason to know of the disability). After all, Keebler had granted the Plaintiff medical leave for her arthritis and continued

that leave several times. Therefore, Keebler's duty to engage in the interactive process was triggered at the point when the Plaintiff attempted to return to work, because at that time Keebler was obviously not only aware that she wished to return to work, and that she was subject to medical restrictions, but also immediately formed a belief that she could not perform the fry packer job because of those restrictions. *Hedberg,* 47 F.3d at 934 ("if an employee tells [her] employer that [she] has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer"); *Zamudio v. Patla,* 956 F.Supp. 803, 808 (N.D.Ill.1997) ("Once a disability has been summoned to the fore, determining what specific actions should be taken by an employer requires an interactive process involving participation by both sides.") (citing *Beck,* 75 F.3d at 1135). However, the only dialogue that occurred between Keebler and the Plaintiff consisted of Innskeep telling the Plaintiff that "There's nothing here you can do." This obviously does not meet Keebler's duty to engage in the interactive process.[13]

Nor did Keebler meet its statutory duty by engaging in a dialogue with the Plaintiff's union pursuant to its collective bargaining agreement. To vastly oversimplify, Keebler's argument is as follows: its collective bargaining agreement with the union provides for a grievance procedure; federal labor law requires bath the union and the employer to engage in the grievance process in good faith; the Plaintiff voluntarily went through this grievance procedure with this claim; the grievance procedure led to an extensive dialogue between the union and Keebler (sufficient to satisfy the interactive process requirement of the ADA) regarding the Plaintiff's capabilities and possible accommodations, but without resolution; that if the Plaintiff feels that her union did not adequately protect her interests, federal labor law allows her to sue her union for its failure to adequately represent her; but that

**13.** Keebler's related argument that the Plaintiff failed to request an accommodation at any time after Keebler made it clear that it would not return her to work is of no moment. A reasonable inference arises from these facts that the Plaintiff may have thought it futile to ask for an

accommodation after Innskeep told her that there was nothing in the plant she could do, and therefore any subsequent failure to commence the interactive process cannot be blamed on the Plaintiff. *See Bultemeyer,* 100 F.3d at 1285.

in the final analysis the interactive process was functionally conducted.

However, Keebler's argument misconceives the nature of the substantive rights provided by the ADA. The ADA grants individuals substantive statutory rights grounded in federal statutory law, and "the union cannot consent for the employee by signing a collective bargaining agreement that consigns the enforcement of [such] statutory rights to the union-controlled grievance and arbitration machinery created by the agreement." *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363 (7th Cir.), *cert. denied* — U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997), and — U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997). Put more simply, the union is an insufficient proxy for the employee in the enforcement of that employee's rights under the ADA, including engaging in the interactive process.

Moreover, *Pryner* also expressly addressed and rejected Keebler's argument that the employee's right to sue his union for a breach of the duty of fair representation will somehow ensure that the union will vigorously assert and defend the full panoply of an employee's statutory rights under the antidiscrimination statutes. First, *Pryner* noted that such a scheme raises the "spectre" of multiple lawsuits to enforce a statutory right. *Id.* at 362. In the instant case, this would entail a suit to force the union to take the grievance all the way to arbitration (which the union did not do), a district court proceeding if either her arbitration failed or the collective bargaining agreement provided more limited rights than the employee's statutory rights, and possibly an additional suit against the union for failing in its duties at arbitration. *See id. Pryner* also alluded to the broad discretion a union has as to whether or not to pursue a grievance, given the tactical and strategic factors at play in the union-employer relationship, and concluded:

The result is that a worker who asks the union to grieve a statutory violation cannot

have great confidence either that it will do so or that if it does not the courts will intervene and force it to do so ... we may not assume that [the union] will be highly sensitive to [employees'] special interests, which are interests protected by [the ADA], and will seek to vindicate those interests with maximum vigor.

*Id.* at 362–63.[14]

Given these observations, it is not difficult to imagine a scenario where employers faced with ADA lawsuits will seek to engage in the interactive process not with the individual employee, but with a union known to be less than aggressive in prosecuting grievances, or with a union whose political situation may render it more prone to sacrificing individual grievances for the good of the entire union. In essence, Keebler's argument places the enforcement of individual statutory rights in the hands of the majority (i.e. the union and its elected officials), a situation rejected by *Pryner:*

The employer's position delivers the enforcement of the rights of these minorities into the hands of the majority, and we do not think this result is consistent with the policy of these [anti-discrimination] statutes or justified by the abstract desirability of allowing unions and employers to cut their own deals.

*Id.* at 363. Finally, Keebler's argument belies the mandate of the regulations, which direct the employer to consult *with the individual with a disability* to determine the appropriate accommodation. *See* Interpretive Guidance § 1630.9 at 362–63 (Process of Determining the Appropriate Reasonable Accommodation). In sum, we must find as a matter of law that Keebler's discussions with the union do not satisfy Keebler's obligation to engage in the interactive process.

### C. Plaintiff's Alternate Theories of Recovery

Having found that the Plaintiff has survived summary judgment on the threshold

14. Although *Pryner* 's central holding addressed, *inter alia,* the question of whether a collective bargaining agreement could compel an employee to arbitrate a claim stemming from federal statutes such as the ADA, we find the court's discus-

sion of the interplay between an employee's statutory rights and the realities of the grievance and arbitration framework instructive for the purposes of the interactive process argument advanced by Keebler.

issue of whether she is a "qualified individual with a disability," we now shift our focus to whether she is entitled to advance her substantive claims at trial. As we previously noted, the Plaintiff seeks to impose liability under alternate (and factually distinct) theories of liability. More particularly, the Plaintiff has succeeded in raising genuine issues of material fact as to whether she is "disabled" by showing both that she is substantially limited in the major life activity of working, and that Keebler regarded her as disabled. *See Cook v. Rhode Island,* 10 F.3d 17, 23 (1st Cir.1993) (record at trial justified either substantial impairment or regarded as theory of disability under the Rehabilitation Act). However, these alternate theories of disability compel a choice between two different paths leading to liability, each path requiring a different analytical approach, and suggesting overall that the Court will probably need to instruct the jury in the alternative should both survive summary judgment. Nevertheless, on this record, the Plaintiff can prevail at trial on only one of these theories and the path to be followed will turn on which reasonable inference the jury ultimately draws from the evidence.

### 1. Disparate Treatment

At bottom, the analysis in this case depends on whether the jury finds that lifting twenty pounds is an essential function of the fry packer job, or alternatively, that lifting twenty pounds is not an essential function, an issue of fact as previously noted. Accordingly, if the jury finds that it was not an essential function of the fry packer job to lift twenty pounds, or that the Plaintiff is in fact capable of lifting twenty pounds, then the jury would be entitled to conclude that Keebler regarded the Plaintiff as disabled, but not that she was substantially limited. Although it has been remarked that cases proceeding under a "regarded as" theory of disability are "hen's-teeth rare," *id.* at 22, logic dictates that if the evidence supports a

regarded as theory of disability, the case must then proceed under a disparate treatment, not a reasonable accommodation, theory.[15] *See Balliett v. Heydt, et al.,* 1997 WL 611609, at *6 (E.D.Pa. Sept.25, 1997) ("We do not believe that Congress intended that an individual who is only perceived to be disabled would be entitled to accommodation.") (quoting *Deane v. Pocono Med. Ctr.,* No. 94–1139, slip op. at 22, 1997 WL 500144 (3d Cir. Aug. 25, 1997), *vacated on grant of rehearing en banc,* 1997 WL 500144 (3d Cir. Oct.3, 1997)).

An employer is liable under the ADA under a disparate treatment framework only if the employer intends to disadvantage an individual precisely because he belongs to the protected group, i.e., is a qualified individual with a disability. *Kariotis v. Navistar Int'l Trasp. Corp.,* 131 F.3d 672, 679 (7th Cir.1997). Intentional discrimination may be established either by direct proof, or via the familiar *McDonnell–Douglas* burden-shifting method. The *McDonnell–Douglas* methodology need only be referred to if there is not enough direct evidence to survive summary judgment. *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir.1990); *DeCastecker v. Case Corp.,* 900 F.Supp. 1041, 1044 (C.D.Ill.1995) (citing *Randle v. LaSalle Telecommunications,* 876 F.2d 563, 569 (7th Cir.1989)).

"Direct evidence of discrimination is evidence that one can interpret as an acknowledgment of the employer's discriminatory intent." *Rothman v. Emory University,* 123 F.3d 446, 451 (7th Cir.1997) (citing *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 667 (7th Cir.1995)). "To constitute direct evidence of discrimination, in other words, 'a statement must relate to the motivation of the decisionmaker responsible for the contested decision.'" *Id.* (quoting *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir.1996)). *See also Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994).[16]

---

**15.** Plaintiff's counsel indicated his agreement with this proposition at oral argument. Of course, if the jury found that an essential function of the job required lifting more than twenty pounds, then this would trigger the attendant reasonable accommodation theory.

**16.** *Troupe,* a Tide VII case, held that circumstantial · evidence consisting of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent

As the Seventh Circuit recently explained:

Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination. This evidence need not be obvious to qualify as direct evidence. Evidence of discriminatory motives must, however, have some relationship with the employment decision in question; inappropriate but isolated comments that amount to no more than "stray remarks" in the workplace will not do. Still, remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality. Proof of this nature supports the inference that a statutorily proscribed factor—race, sex, age, or in this case, religion—was at least a motivating factor in the adverse employment action at issue.

*Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir.1997).

Innskeep's alleged statement to the Plaintiff that "There is nothing here that you can do," which came immediately after Innskeep reviewed the Plaintiff' medical restrictions, coupled with Gates' deposition testimony that Keebler did not return the Plaintiff to work because of her physical restrictions, (*see* Gates Dep. at 86, 136), clearly constitutes direct evidence that Keebler's decision not to return the Plaintiff to the fry packer position was motivated by the Plaintiff's disability. Therefore, Keebler's summary judgment motion must be denied as to the Plaintiff's disparate treatment claim.

### 2. Reasonable Accommodation

On the other hand, if the jury finds that lifting twenty pounds is an essential function of the fry packer position, and further finds that the Plaintiff cannot in fact lift twenty pounds, then the Plaintiff's theory of recovery will be Keebler's failure to accommodate her disability. In order to recover under a failure to reasonably accommodate claim, the Plaintiff has to show that:

(1) she "was or is disabled" as defined by the ADA;

(2) that Keebler was aware of the disability;[17] and

(3) that she was an "otherwise qualified individual" for the position in question.

*Best,* 107 F.3d at 547–48 (citing *Bultemeyer,* 100 F.3d at 1284); *Tuszkiewicz v. Allen–Bradley Co., Inc.,* 967 F.Supp. 1119, 1130 (E.D.Wis.1997); *Hammer v. Bd. of Educ. of Arlington Heights Sch. Dist. No. 25.,* 955 F.Supp. 921, 925 (N.D.Ill.1997). As *Bultemeyer* indicates, a Plaintiff who raises genuine issues of material fact as to whether he or she is "disabled" and a "qualified individual" has, at least for the purposes of surviving summary judgment, directly established a violation of the ADA. *See Bultemeyer,* 100 F.3d at 1283. Therefore, for all the reasons discussed *supra,* the Plaintiff has provided sufficient evidence to defeat Keebler's motion for summary judgment on her reasonable accommodation claim.

### D. Damages

In the alternative, Keebler moves for partial summary judgment under the "after-acquired evidence" doctrine articulated in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), based on its discovery during the Plaintiff's deposition that she lied on her Keebler employment application.[18] In

---

might be drawn," may provide direct evidence of intentional discrimination. *Id.* at 736.

**17.** As discussed *supra,* there is no dispute that Keebler was aware of the Plaintiff's arthritic condition.

**18.** The Plaintiff only completed the ninth grade of high school, but indicated on her employment application that she had completed the twelfth grade. Pl. Dep. at 245. Apparently, the position

for which she originally applied required twelve years of education. The application form the Plaintiff completed reads, just above the signature line:

... This certifies that this application was completed by me and that all entries on it and information in it are true and complete to the best of my knowledge. I further understand that any false answers or statements made by me on this application or any supplement

*McKennon* the Supreme Court held that an employee's discrimination lawsuit is not precluded by the fact that the employer later discovers (presumably during the subsequent discrimination litigation) evidence of wrongdoing by the employee which provides the employer legitimate grounds for dismissal. *Id.* at 357, 115 S.Ct. at 884. However, such after-acquired evidence does bear on the Plaintiff's array of available remedies; the employer is not required to offer reinstatement or provide front pay, and only has to provide backpay from the date of the discharge to the date the after-acquired information was discovered. *Id.* at 362, 115 S.Ct. at 886. To prevail on its after-acquired evidence of wrongdoing defense, the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63, 115 S.Ct. at 886–87.

To meet this burden, Keebler advances only the affidavit of Gates, in which Gates states that employee dishonesty was grounds for immediate termination from Keebler, and that pursuant to that policy he, as Director of Human Resources, would have immediately terminated the Plaintiff had he known that she lied on her employment application. Gates Aff. ¶¶ 41–42. Keebler's Rules and Regulations, attached to the Gates affidavit, do in fact list "Dishonesty with the Company or another employee" as a ground for immediate discharge. *See id.* exh. Q (Keebler Company/Bluffton Bakery Rules and Regulations) at Sec. 5(8). The Plaintiff's brief responds by arguing that Keebler's evidence demonstrates only that it *could* have terminated her based on her fraudulent application, not that it *would* have done so, and therefore Keebler has not met its burden under *McKennon.*

Prior to *McKennon,* the Seventh Circuit had held that a discrimination suit was precluded if an employer presented evidence showing that it would have terminated an employee based on wrongdoing revealed by after-acquired evidence. *Washington v.*

*Lake County, Illinois,* 969 F.2d 250 (7th Cir.1992). The employer's burden under this "would have" standard was met in *Washington* by two affidavits stating only that the after-acquired knowledge of wrongdoing, "if known at the time of [the plaintiff's] employment, would have led to his immediate discharge." *Id.* at 256. The burden then shifted back to the plaintiff "to produce affirmative evidence that punctures [the affiants'] assertion of knowledge regarding these matters." *Id.* at 257. In the absence of such evidence, the employer prevailed on summary judgment, and the discrimination suit was dismissed.

Obviously, the final result in *Washington* was overruled by *McKennon,* in that after-acquired evidence of wrongdoing no longer precludes a discrimination lawsuit. However, the standard the employer must meet is the same under both cases: the employer must prove that it "would have" terminated the employee on the given grounds. *Compare Washington,* 969 F.2d at 256 ("we ultimately conclude that there is no genuine issue of material fact whether Washington would have been fired if the Department had discovered [the after-acquired evidence]") *with McKennon,* 513 U.S. at 362–63, 115 S.Ct. at 886–87 ("Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.") Cases subsequent to *McKennon* have noted the continued viability of *Washington* 's articulation of this "would have" standard. *See O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756, 761 (9th Cir.1996) ("An employer can avoid backpay and other remedies by coming forward with after-acquired evidence of an employee's misconduct, but only if it can prove by a preponderance of the evidence that it would have fired the employee for that misconduct.") (citing *Washington* ); *Id.* at 762 (citing *Washington* for the proposition that an uncontradicted affidavit by an employer is enough to meet its burden under

---

thereto will be sufficient grounds for immediate dismissal.

Def. Mem. in Supp. exh. A at 2.

*McKennon*); *Petrovich v. LPI Service Corp.*, 949 F.Supp. 626, 630 (N.D.Ill.1996) ("Requiring affidavits to prove the employer's reliance on after-acquired evidence is in line with Seventh circuit case law before *McKennon.*") (citing *Washington*).

At oral argument the Plaintiff contended that *McKennon* signaled a change to a more stringent burden on the employer to prove the after-acquired evidence defense, which, counsel explained, should leave us to question the continuing viability of *Washington*'s conclusion that employers could carry their burden by affidavits alone. The Plaintiff supported this contention by arguing that this shift to a more stringent analysis is evidenced by the emerging caselaw as found in *Petrovich*; *Rusnak v. Housing Authority of the City of Bridgeport*, 963 F.Supp. 161 (D.Conn.1997); and *Weeks v. Coury*, 951 F.Supp. 1264 (S.D.Tex.1996).[19]

The Plaintiff's analysis is off the mark. *Petrovich* clearly states that an employer's sworn testimony in the form of an affidavit can be sufficient to meet its burden under *McKennon*, and moreover expressly notes the continuing validity of *Washington*'s analysis. *Id.* at 630 (citing *Washington* and *Wallace v. Dunn Construction Co.*, 62 F.3d 374, 380 (11th Cir.1995)).

The *Rusnak* case arose on a post-trial motion, not on summary judgment, and also does not expressly hold that an employer's affidavits are insufficient to meet its burden under *McKennon*. In fact, and in contradis-

tinction to the record before this Court, the *Rusnak* court found that the plaintiff there had placed sufficient evidence into the record at trial to support the jury's finding that the employer would not have fired him had it discovered his resume misrepresentations. *Id.* at 170–71. As discussed *infra*, the Plaintiff has produced no such evidence here.

Finally, the *Weeks* case is actually inapposite to the Plaintiff's argument. In *Weeks*, the employer proffered evidence by way of an affidavit showing that it would have fired the employee had it known of the specific misrepresentations later found in the employee's employment application. The employee attempted to argue (as does the Plaintiff here) that the misrepresentation was "immaterial" to his ability to perform his job, and therefore was not sufficient to warrant a discharge. The *Weeks* court disagreed, and held that the employee's argument represented "merely his personal subjective opinion," and did not constitute sufficient evidence to defeat the employer's summary judgment motion. In fact, the court found it significant that the plaintiff had proffered no evidence of similar misrepresentations by any other employee that had come to the attention of the employer and which had not resulted in a termination. *See id.* at 1273–75. At bottom, the Plaintiff's assertion that the after-acquired evidence caselaw is moving away from the standards adduced in *Washington* is unpersuasive. *See, e.g., O'Day*, 79 F.3d at 762.[20]

**19.** The Plaintiff also made a passing reference to *Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409 (6th Cir.1992). A pre-*McKennon* case, *Johnson* did not employ the "would have" standard, but held that the employer need only show that the after-acquired evidence established a valid and legitimate reason for the termination of employment, and that the employer actually relied upon that reason. *Id.* at 414. This is an easier burden to meet than showing that the employer would in fact terminated the employee based solely on the later-discovered reason. Thus, *Johnson* does not advance the Plaintiff's argument, even to the extent that *Johnson* remains good law. *See Weeks*, 951 F.Supp. at 1274 n. 53 (noting that the *McKennon* decision has called the authority of *Johnson* into "serious doubt").

**20.** The *O'Day* majority recognized that affidavits merely reciting that the employer "would have"

terminated the employee, though made under oath, are somewhat self-serving and speculative, given that the employer is in reality making an *ex post facto* employment decision with the benefit of both hindsight and legal advice, and well-knowing that making such a statement will limit its damages. *Id.* at 762. However, the *O'Day* majority also recognized that the fact that such an affidavit is capable of being impeached does not render it incompetent, and thus an employer must be allowed to rely upon sworn affidavits from its employees in proving its after-acquired evidence defense. *Id.* We do not think, as the Plaintiff fears, that *O'Day* or *Washington* create a rule that allows the employer's mere bald assertions made under oath to always satisfy the employer's burden under *McKennon*. *See Seshadri v. Kasraian*, 130 F.3d 798, 801–02 (7th Cir.1997) (sworn affidavit testimony does not create a genuine issue of material fact if, under the circum-

Absent direction from the Seventh Circuit to the contrary, we are obliged to follow the holding of *Washington* that a credible affidavit asserting that the employer would have fired the employee for the misconduct revealed by after-acquired evidence is sufficient to meet the employer's burden under *McKennon.* Gates's affidavit unequivocally states that he would have immediately terminated the Plaintiff had he known that she lied on her employment application, and this assertion is bolstered by the unchallenged fact that Keebler has a company policy that calls for the immediate discharge of employees who have been dishonest in their dealings with the company. Moreover, Gates' assertion does not belie common sense; indeed, there is nothing inherently incredible about Keebler requiring a certain level of education for its workforce, or following its company policy to the letter, strict as it may be. The importance to Keebler that its employees possess at least a high school diploma is evidenced by the fact that the employment application (which seeks information on educational attainments) itself warns prospective employees of the seriousness with which Keebler treats employee dishonesty, particularly the responses given on the application.[21] Faced with such evidence, the burden shifts to the Plaintiff to produce affirmative evidence that punctures Gates' (and thus Keebler's) assertion that she would have been terminated had Keebler known she lied on her application. *Washington,* 969 F.2d at 257.

The Plaintiff has produced no such evidence. Her only plausible argument[22] is

that "it is inherently doubtful" that defendants would have imposed such a harsh sanction on a factory worker, particularly one who had successfully performed her job for eight years, merely because she made false claims about her education. However, this is exactly the type of personal subjective opinion the *Weeks* court characterized as a "conclusory statement[,] not factual evidence sufficient to defeat a motion for summary judgment." *Weeks,* 951 F.Supp. at 1275. Therefore, as in *Washington,* Gates' affidavit remains essentially uncontradicted. Consequently, partial summary judgment must be GRANTED to Keebler on the issue of damages on the basis of after-acquired evidence relating to the intentional misrepresentations contained in the Plaintiff's employment application.

## VI. CONCLUSION

For the foregoing reasons Keebler's motion for summary judgement is DENIED as to the Plaintiff's claims for liability, and is GRANTED as to the limitation of its damages based on its after-acquired evidence of the intentional misrepresentations in the Plaintiff's employment application. We emphasize that the evidence in the record, when all favorable inferences are drawn in the Plaintiff's favor, merely suffices to fend off summary judgment on the issue of liability, and the Court's opinion should not in any way be taken as indicative of the strength of the merits of the case at trial.[23]

stances, no reasonable person would believe it.) For example, the *O'Day* majority found it significant that the employer's company policy, as well as common sense, supported the statements made in its affidavits. *Id. See also Washington,* 969 F.2d at 257 ("To be sure, this evidence [of a company policy to fire employees for dishonesty] would have bolstered the [defendant's] case.")

**21.** We repeat the precise wording of the employment application:

I further understand that any false answers or statements made by me on this application or any supplement thereto will be sufficient grounds for immediate dismissal.
Def. Mem. in Supp. exh. A at 2.

**22.** The Plaintiff's brief also argues that "The fact that Coleman intentionally lied in order to obtain a good-paying job is understandable and commonplace." Pl. Resp. Br. at 35. Keebler job applicants who did stick it out through twelve years of schooling but who were not able to obtain employment at Keebler during the time that the Plaintiff held a job there might not share this rather charitable view. Nonetheless, the statement is nothing more than argument, and thus fails to raise a genuine issue of material fact, given that the Plaintiff points to no evidence documenting how "commonplace" this all was at Keebler.

**23.** On February 24, 1998, Keebler filed a "Verified Motion to Continue Trial," reciting that Kee-

bler's lead counsel is undergoing major surgery today and will need to recuperate up to and even beyond the April 7, 1998, trial date. This motion will be discussed at the final pre-trial conference set for March 6, 1998, at 1:30 p.m.